UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ELAINE L. CHAO, Secretary of Labor,　*
United States Department of Labor,　　*
　　　　　　　　　　　　　　　　　*
　　　　　　　Plaintiff,　　　　　　*
　　　　　　　　　　　　　　　　　*　　Civil Action No. 04-12356-PBS
v.　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　*
BRANCH NO. 34, NATIONAL　　　　　*
ASSOCIATION OF LETTER　　　　　　*
CARRIERS, AFL-CIO,　　　　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　　　Defendant.　　　　　　*

---

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56, Federal Rules of Civil Procedure, and the Labor-Management Reporting and Disclosure Act, 29 U.S.C. 481-483 (hereafter, "LMRDA" or the Act), the Secretary is entitled to summary judgment because, as a matter of law, in the absence of disputed material facts, Defendant (hereafter, "Branch 34" or the union), violated 29 U.S.C. § 481(e), when it failed to mail election ballots to at least 87 members eligible to vote in the March 9, 2004, election of Branch 34 officers (hereafter, "the election"). The undisputed facts further show that Defendant, in the same election, permitted the use of union funds to promote or support the candidacy of the incumbent President, in violation of 29 U.S.C. § 481(g). Accordingly, the Secretary requests that this Court declare the election null and void and order a new election to be held under the supervision of the Secretary.

# I.  **FACTS OF THE CASE**

**Background**

On or about June 28, 2004, the Secretary received a complaint, dated June 25, 2004, from a member of Branch 34 challenging the 2004 election of officers. Complainant Edward R. Masiello (hereafter, "Masiello") alleged, among other things, that Branch 34 used an incomplete and inaccurate mailing list when mailing ballots for the election.  He further alleged that Branch 34 permitted union funds to be used to promote or support the candidacy of incumbent President Robert Lind (SF ¶¶ 88,89), in that Lind used the union newspaper, Branch 34 Clan (hereafter, the "*Clan*"), to campaign for President (SF 89).   In particular, Masiello alleged that Lind's end of term report, which was published in the November-December 2003 issue of the *Clan*, was an advocacy piece even though Lind's term was not scheduled to end until March 31, 2004 (SF ¶¶ 48, 49).

Branch 34, a local branch of the National Association of Letter Carriers (hereafter, NALC), is located in South Boston, Massachusetts (SF ¶ 2).  Branch 34 operates under the auspices of the NALC Constitution and has promulgated its own Constitution and Bylaws (SF ¶¶ 8, 9).  Branch 34 publishes the *Clan* on a bi-weekly basis (SF ¶ 37). Branch 34 pays all costs associated with the publication and distribution of the *Clan* to Branch 34 members (SF § 38).   Each issue of the *Clan* includes an article written by the Branch president.  With respect to the duties of the President, the Branch 34 Constitution and bylaws provide that "[a]t the end of his/her term, he/she shall make a report showing the progress and condition of the Branch" (SF ¶ 10).  Although other provisions of the Constitution and bylaws make direct reference to the *Clan* and require that certain

information be published in the *Clan*, the Constitution and bylaws do not require that the President's end of term report be published in the *Clan*  (SF ¶¶ 9, 10.)

Elections of Branch 34 union officers are governed by the provisions of the NALC Regulations Governing Branch Election Procedures (hereafter, "NALC Election Regulations"), as well as the Branch 34 Constitution and Bylaws (SF ¶¶ 12, 13).  The Branch 34 Constitution and Bylaws mandate that elections be held every three years and that elections be conducted by "mail-out, mail-back" balloting, and that notice of the election and nomination proceedings be published in the *Clan*  (SF ¶¶ 16, 19).  The Branch 34 Constitution and Bylaws also require that nominations for candidates be made and accepted at the union meeting scheduled for January and that election ballots be tallied at the union meeting scheduled for March  (SF ¶¶ 14, 15).

The Branch 34 Constitution and Bylaws provide that after ballots are tallied, union members may seek a recount of ballots (SF ¶ 22).  In addition, the NALC Election Regulations provide that an "aggrieved" member may protest the conduct of an election. (SF ¶ 23.)  An initial election protest is made to the Branch Election Committee (SF ¶ 23).  An appeal of the decision of the Branch Election Committee is made to the Branch Executive Board  (SF ¶ 24).  Appeal of a decision of the Branch Executive Board is made to Branch membership (SF ¶ 25).   Any subsequent appeal is made to the NALC Committee on Appeals (SF ¶ 26).  A member dissatisfied with the decision of the NALC Committee on Appeals may appeal that decision to the National Convention of the NALC (SF ¶ 27).  Finally, the LMRDA provides that a union member may file a complaint with the Secretary if the union has not issued its final decision within three calendar months of the institution of the protest.  29 U.SC. § 482(a)(2).

**Conduct of the Election**

Murdock Mailing Company, Inc. (hereafter, "Murdock") serves as a mailing agent for Branch 34 and is responsible for mailing the Clan and the election ballot packages (SF ¶¶ 39, 40, 64).  As mailing agent for Branch 34, Murdock maintains a mailing list for Branch 34.  (SF ¶¶ 42.)  Branch 34 periodically provides Murdock with updates or corrections to the Murdock mailing list (SF ¶ 43).

Notice of the election and nomination proceedings for the March 9, 2004, election was published in the July-August, 2003, September-October 2003, and November-December 2003 issues of the *Clan*.  (SF ¶ 47.)  Murdock mailed out the 2003 and 2004 issues of the *Clan* to individuals listed on its mailing list.  (SF ¶ 41.)  The Murdock mailing list contains the names of actively employed union members, retirees, and subscribers.  (SF ¶ 45.)  The "subscribers" on the mailing list are not eligible to vote in Branch 34 elections.  (SF ¶ 46.)

Nominations for the March 2004, election were made and accepted at the membership meeting on January 13, 2004 (SF ¶ 55).  Incumbent President Robert Lind was nominated for the office of President (SF ¶ 56).  Also nominated for the Office of President was Masiello, who had served as President of Branch 34 for the period April 1, 1998, through March 31, 2001 (SF ¶¶ 57, 58).  He was defeated in the March 2001 election by Lind.  Lind's term as President ran from April 1, 2001, through March 31, 2004  (SF ¶ 49).

Lind's team of candidates, the "Lind-McMahon team," issued campaign literature and paid the cost of producing and mailing its campaign literature (SF ¶ 59, 60).[1]  In addition, Lind published an "end of term report" in the November-December 2003 issue of the *Clan*  (SF ¶ 48).  That issue was mailed to Branch members on or about January 14, 2004, one day after nominations for office and the start of the campaign for the election (SF ¶ 41).  Lind's end of term report essentially duplicates statements contained in his campaign literature and the campaign literature of his team.  The report criticizes the prior administration that was headed by Masiello, praises the alleged improved relationship between Branch 34 and the NALC ("reestablishing Branch 34's credibility with the NALC"), praises lobbying efforts by the Lind administration and promotes Lind's continued tenure as President of the union.

In preparation for the March 2004 election, the Branch 34 Financial Secretary obtained a list from the NALC of Branch 34 members in good standing (SF ¶ 71).  Branch 34 election officials relied on the NALC list to determine members' eligibility to vote when the election ballots were returned (SF ¶ 78).  However, Branch 34 never compared the NALC list of members in good standing with the Murdock mailing list, nor provided the NALC list to Murdock (SF ¶ 72).  The NALC list included 145 members in good standing, eligible to vote in the election, that were not on the Murdock mailing list (SF ¶ 102).

On February 19, 2004, Murdock mailed election ballot packages to the members on its mailing list (SF ¶ 68).  In order for ballots to be counted in the March 2004

---

[1]  Branch 34 mailing agent Murdock mailed Lind-McMahon campaign literature on the following dates:  January 30, 2004, February 7, 2004, February 12, 2004, February 18, 2004 and February 19, 2004  (SF ¶ 64).  Murdock also mailed Masiello's campaign literature, at Masiello's expense, on the following dates:  January 14, 2004, February 10, 2004, February 13, 2004, February 18, 2004, February 19, 2004 and February 20, 2004 (SF ¶ 62).

election, they were to be received by Branch 34 no later than 9:00 a.m., March 9, 2004 (SF ¶ 69).  Following the mailing of ballot packages on February 19, 2004, Branch 34 received inquiries from a number of union members asserting that they had not received a ballot package and requesting that the union mail one out (SF ¶ 74).  If a union member requested a ballot, Branch 34 mailed an election ballot package to the member[2] (SF ¶ 75).

On March 9, 2004, Branch 34 election personnel checked the name of each individual who submitted a ballot on time against the NALC list of members in good standing, placed a mark beside the individual's name on the NALC list (SF ¶¶ 77, 78, 79), and tallied the ballots.  On March 11, 2004, Branch 34 published the election results (SF ¶ 80); Lind received 1,335 votes for President and Masiello received 1,252 votes (SF ¶ 81).  Lind's margin of victory was eighty-three (83) votes (SF ¶ 81).  Following the publication of voting results, three candidates for office sought a recount of the ballots for President, Trustee and Area Steward (SF ¶ 82).  On March 25, 2004, a recount for three offices was conducted (SF ¶ 84).   The Re-Count election results show that Robert Lind received 1,335 votes for the office of President while Masiello received 1,251 votes (SF ¶ 86).   Lind's margin of victory was eighty-four (84) votes[3] (SF ¶ 86).

One hundred forty-five union members eligible to vote in the election were not on the February 19, 2004 Murdock mailing (SF ¶ 107).  Of the one hundred forty-five eligible members who were listed and, therefore, did not receive ballots, fifty-eight

---

[2] Requested ballot packages were mailed after February 19, 2004.  The date that each ballot package was mailed, however, cannot be determined.

[3] The margin of victory for the office of Steward was seventeen (17) votes and for the office of Trustee was forty-six (46) votes.

requested that the union provide them with ballots (SF ¶ 109).  The remaining eighty-seven eligible Branch members never received election ballots and were prevented from participating in the election (SF ¶ 110).

## Election Protest and Investigation

By letter dated March 25, 2004, Masiello protested the conduct of the election to the Branch Election Committee.  (SF ¶ 87)  Masiello asserted, among other things, that the election violated the provisions of the Act in that not all union members were provided with the opportunity to cast ballots because Branch 34 had used an incomplete and inaccurate mailing list, the Murdock list (SF ¶ 88).  Masiello also alleged that the election violated the Act in that union funds were used to promote the candidacy of one or more of the candidates, by the publication of candidate Lind's end of term report in the November-December 2003 issue of the *Clan* (SF ¶ 89).

By letter dated April 22, 2004, to Masiello, the Branch Election Committee denied Masiello's protest (SF & 90), stating:

> The Financial Secretary did prepare alphabetical list of all members used by Murdock Mailing with whatever changes that was necessary.  Financial Secretary also requested from NALC in DC a list of all members of Branch 34 in good standing, which was checked against all returned ballots on March 9, 2004.  The list was requested on January 23, 2004.
>
> The Election Committee does not agree that President Lind used the Nov-Dec CLAN as Political Literature.  As President of the Branch, it was his duty to provide as much information concerning Branch business, which his end of term report was.

(SF ¶¶ 91, 92).

By letter dated April 23, 2004, Masiello appealed the decision of the Branch Election Committee to the Branch Executive Board (SF ¶ 93), which, on May 20, 2004,

denied Masiello's appeal on the basis of untimeliness (SF ¶ 94). The Branch Executive

Board decision stated:

> The appeal from Masiello mailed on March 27, 2004 to the
> Branch 34 Election Chairman was dated March 25, 2004.
> The date of the election in question was March 9, 2004 and
> the appeal was not mailed until March 27, 2004. His appeal
> was not filed with the required time frame (five days) and was
> thirteen days late. A recount was called for by three
> candidates but that did not negate the actual date of the
> election and the regulations in place relating to the appeal
> process.

(SF ¶ 95).

Based upon the Branch Executive Board's denial of his protest, by letter of May

27, 2004, Masiello appealed the decision of the Branch Executive Board to the Branch

membership (SF ¶ 96). At its June 8, 2004 membership meeting, the membership denied

Masiello's appeal (SF ¶ 97). By letter of June 24, 2004, Masiello filed an appeal with the

NALC's National Committee on Appeals (SF ¶ 98). On or about June 28, 2004, Masiello

filed a complaint with the Secretary (SF ¶¶ 99).

## II. <u>THE APPLICABLE LAW</u>

The LMRDA is designed to provide for the democratic election of labor union

officers. <u>Local 3489, United Steelworkers of America v. Usery</u>, 429 U.S. 305, 309

(1977). The principal purpose of the LMRDA is to prevent undemocratic practices in

unions. <u>See</u> <u>Wirtz v. Hotel, Motel & Club Emp. Union, Local 6</u>, 391 U.S. 492, 496

(1968).

Title IV of the Act establishes a set of substantive rules regarding election of union

officers. 29 U.S.C. §§ 481-483. Unions are free "to run their own elections" so long as

the unions' conduct conforms to the LMRDA's minimum standards.  United Steelworkers of America v. Sadlowski, 457 U.S. 102, 117 (1982), quoting Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 389 U.S. 463, 471 (1968).

The Act requires compliance with "adequate safeguards to insure a fair election" of union officers.  29 U.S.C. § 481(c).  The responsibility for insuring a fair election lies with the union.  Hodgson v. United Mine Workers, 344 F. Supp. 17, 26 (D.D.C. 1972).  United Steelworkers v. Sadlowski, 457 U.S. at 117.   "A labor organization's wide range of discretion regarding the conduct of its elections is . . . circumscribed by a general rule of fairness."  29 C.F.R.  § 452.110.  Title IV sets out a number of election procedures that unions are required to fulfill.  Crowley v. Local No. 82, 679 F.2d 978, 983 (1st Cir. 1982).  Fundamental to fairness is the right of all eligible union members to vote in an election: "every member in good standing . . . shall have the right to vote for . . . the candidate or candidates of his choice. . . ."   29 U.S.C. § 481(e).  See Marshall v. American Postal Workers Union, 486 F. Supp. 79, 82 (D.D.C 1980); Dole v. Graphic Communications Int'l Union, 722 F. Supp. 782, 784 (D.D.C. 1989).  The Act's implementing regulations make this clear:

> **Distribution of ballots**.
>
> So long as secrecy of the ballot is maintained, there is no restriction on how the ballots are distributed to the voters.  Any method which *actually provides* each eligible voter with one blank ballot would be in conformance with the law.

29 C.F.R. § 452.115 (emphasis added).

The Department of Labor's interpretive regulations also set "Campaign Safeguards"for the campaign portion of an election:

**Use of Union funds.**

No funds [derived from dues, assessment, or similar levy] may be contributed or applied to promote the candidacy of any person in an election subject to Title IV.

29 C.F.R. § 452.73.

**Campaigning by union officers**

[C]ampaigning must not involve the expenditure of funds in violation of section 401(g) [29 U.S.C. § 481(g)]. Accordingly, officers and employees may not campaign on time that is paid for by the union nor use union funds, facilities, equipment, stationery, etc., to assist them in such campaigning.

29 C.F.R. § 452.76.

**Union newspapers**

The provisions of section 401(g) prohibit any showing of preference by a labor organization or its officers which is advanced through the use of union funds to criticize or praise any candidate. Thus, a union may neither attack a candidate in union-financed publication nor urge the nomination or election of a candidate in a union-financed publication nor urge the nomination or election of a candidate in a union-financed letter to the members. Any such expenditure, regardless of amount, constitutes a violation section 401(g).

29 C.F.R. § 452.75.

The exclusive remedy for violations of the fair election requirements of the LMRDA is a civil action instituted by the Secretary. 29 U.S.C. § 482(b). Wirtz v. Glass Bottle Blowers, 389 U.S. at 472. Union members are required to complain about the conduct of an election through internal union procedures, and if unsuccessful, they may file a complaint with the Secretary. 29 U.S.C. § 482(a). See Trbovich v. UMW, 404 U.S. 528, 530 (1972). Once the Secretary investigates a complaint and "finds probable cause

to believe that a violation of [the Act] . . . has occurred and has not been remedied," she may "bring a civil action against the labor organization as an entity . . . to set aside the invalid election, if any, and to direct the conduct of an election . . . upon the removal of officers under the supervision of the Secretary . . . . 29 U.S.C. § 482(b). See Harrington v. Chao, 372 F.3d 52, 55 (1st Cir. 2004). If the Court finds that the violation "may have affected the outcome of an election," the Court is required to declare the election "void and direct the conduct of a new election under the supervision of the Secretary. . . ." 29 U.S.C. § 482(c); Reich v. Local 843, Bottle Beer Drivers, 869 F. Supp. 1142, 1151 (D.N.J. 1994); Wirtz v. Nat'l Maritime Union of America, 284 F. Supp. 47, 587 (S.D.N.Y. 1968), aff'd, 399 F.2d 544 (new election to be held where reasonable probability that violation may have affected outcome of election of any union officer).

## IV. ARGUMENT

### A. Complainant's Challenge to the Election is Timely and Ripe.

Section 402(a) of the Act requires union members to invoke "remedies available under the constitution and bylaws of [the labor] organization" before filing an administrative complaint with the Secretary. 29 U.S.C. § 482(a). The NALC Regulations Governing the Election of Branch Officers and the Branch 34 Constitution and Bylaws provide that a union member may seek a vote recount for election of officers. The member must file a written petition for the recount, signed by one hundred members in good standing "within five (5) business days of the election," and "All objections to the conduct of an election by an aggrieved member must be submitted to the Chairperson of the Branch Election Committee within five (5) days after the date of the election." Exhibit 5, NALC Election Regulations, Section 21.2.

The decision that Masiello's complaint was untimely is clearly unreasonable. Masiello filed his complaint to Branch 34 within five days of the recount and certification of the election, as required by the rule. The rule requires a complainant to be "aggrieved" in order to protect an election, and a member cannot be considered "aggrieved" until after the recount and certification of ballots, since he will not know the outcome of the election until that time. Any other interpretation would have union members filing appeals and Branch 34 considering them before it is known whether there is a real controversy and would leave potential complainants uncertain of whether to proceed. Moreover, the NALC has previously determined that the five-day period within which to appeal runs from the certification of the election after recount. In Kelly O'Shea, Branch 34, Boston, MA (SF ¶¶ 35, 36), the NALC was asked to rule after the last, 2001 officers election at this very branch whether an appeal was timely, when the member filed an appeal within five days of the union's certification of a recount vote. The NALC interpreted its rule to require the filing of appeals within the five day period after the recount, and not from the original election (SF ¶¶ 28, 31, 32, 36) ("Appellant was entitled to wait for the results of the election to be certified following a recount of the ballots conducted by the Election Committee.").

Although the decision regarding the five day period for appeal is a decision by the NALC, that decision is consistent with the courts' reluctance to impose a construction on a union rule that will deny a protest on procedural grounds. See Donovan v. CSEA Local Union 1000, AFSCME, 761 F.2d 870 (2d Cir. 1985)("[A] heavy burden is imposed on the union to demonstrate that it did not have adequate notice of the protest, keeping in mind that 'members should not be held to procedural niceties while seeking redress within their union.'") The reluctance is particularly clear where a union has addressed the merits of

the protest.  See Donovan v. Local 126, Int'l Bhd of Elec. Wrkrs, 728 F.2d 610, 613 (3rd

Cir. 1984); Chao v. North Jersey Area Local Postal Workers Union, 211 F.Supp.2d 543,

554 (D.N.J. 2002).

Masiello complied with all NALC election appeal procedures.   He filed his

complaint with the Secretary only after he had exhausted the various stages of protest.[4]

He was entitled to have the merits of his complaint considered, and, accordingly, Branch

34's determination that his protest was untimely and was required to be filed before the

recount and certification of the election was unreasonable and contrary to the NALC's

own rules.


**B.     Defendant Violated the Act by Failing to Mail Election Ballots To
        All Union Members Eligible To Vote.**

The undisputed facts demonstrate that Defendant failed to mail election ballots to

all union members eligible to vote in the election, in violation of 29 U.S.C. § 481(e).  The

mailing list used by the Branch 34 mailer, Murdock, to mail election ballots excluded one

hundred forty-five eligible union members.  While approximately fifty eight of the

excluded members realized in time that they were supposed to receive ballots and had not,

at least eighty-seven eligible members did not receive ballots and were not provided the

opportunity to vote.  Although Branch 34 had a complete lis of eligible members, the

NALC list, which it relied upon to check the eligibility of voting members, Branch 34

never determined whether the Murdock list was consistent with the NALC list, even after

it got requests from many members for ballots.

---

[4]Pursuant to 29 U.S.C. § 482(a)(2), a union member need not await completion of internal union
procedures if the union has not issued its final decision within three calendar months of the
institution of the protest

Moreover, it is undisputed that Branch 34 failed to provide any of the 145 members with adequate notice of the election.  The notice of the election and nomination proceedings was published in the 2003 issues of the *Clan*, which Murdock mailed only to those individuals listed on its mailing list, rather than to all members eligible to vote.   As a result, the *Clan* mailings did not provide notice of the election as required by  29 U.S.C. § 481(e), and its implementing regulations, 29 C.F.R. § 452.99.  See Donovan v. District 35, 702 F.2d 25, 27 (1st Cir. 1983) (district court erred in failing to direct a new election where notice of election not provided to all union members by mail); Reich v. Local 843, 869 F. Supp. at 1142.

Section 401(e) provides that "every member in good standing . . . shall have the right to vote for . . . the candidate or candidates of his choice . . ." 29 U.S.C. § 481(e). This provision requires that each member be given an opportunity to exercise his or her right to vote.   See e.g., Chao v. Local 54, Hotel and Restaurant Employees, 166 F.Supp.2d 109, 120 (D.N.J. 2001); American Postal Workers Union, 486 F.Supp. at 82; Marshall v. Office of Professional Employees Union, Local 2, 505 F. Supp. 121, 123 (D.D.C. 1981) ("[T]he statute clearly and unambiguously requires that notice of the election be sent to the last know home address of each Union member.").  A union violates section 401(e) of the Act when it deprives eligible members of the right to vote. See Dole v. Graphic Comm., 722 F. Supp. at 784, 786 (union must ensure its actions do not deprive members of right to vote).   See also Brock v. American Postal Workers, 1986 W.L. 15272 at *2, 123 L.R.R.M. 3048 (new election held where three members in good standing not mailed ballots and the election was decided by two votes); Marshall v. American Postal Workers, 486 F.Supp. at 82; Martin v. Radio-Electronics Officers Union, 813 F.Supp. 878 (D.D.C. 1993) (union properly held a supplemental election

when twelve members were not mailed notice of the election or ballots and the original election was decided by eleven votes).[5]

As the regulations make clear, the method of distribution of ballots must "actually provide each eligible voter with one blank ballot." 29 C.F.R. § 452.115. In this case, eighty-seven eligible voters did not receive an election ballot and were disenfranchised. Branch 34 had the ability to provide these members with the opportunity to vote; it had the names and addresses of those eligible members in the NALC list. For whatever reason, it chose not to compare that list to the Murdock mailing list and chose not to provide that list to Murdock, with the dismal result described herein.

**C.     Defendant Violated the Act by Permitting Use of Union Funds to Promote the Candidacy of Lind.**

29 U.S.C. § 481(g) provides:

> No moneys received by any labor organization by was of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in any election subject to the provisions of this subchapter. Such moneys of a labor organization may be utilized for notices, factual statements or issues not involving candidates, and other expenses necessary for the holding of an election.[6]

The Act prohibits the use of a "union-financed publication [to] urge the nomination or election of a candidate. . .." 29 C.F.R. § 452.75. The NALC regulations also specifically caution against the endorsement of candidates in union newspapers. In a

---

[5]A violation of this provision does not require proof of bad intent on the part of Branch 34. Donovan v.Local 10902, Communications.Workers of America, 650 F.2d 799, 801 (5th Cir. 1981) (citing Wirtz v. Hotel Employees Local 6, 391 U.S. at 503) (rejecting notion that the failure to provide ballots should be excused because the union's mistake was not caused by fraud or bad faith).

[6] The express purpose of section 401(g) is "to prevent discourage and make unprofitable improper conduct on the part of union officials, employers and their representatives. S.Rep. No. 187, 186th Cong., 1st Sess., reprinted in 1959 U.S. Code Cong & Admin News 2318, 2321.

comment to that regulation, the NALC states: "This provision is commonly violated in branch elections.  The bottom-line is that a branch is <u>absolutely prohibited</u> from criticizing or endorsing <u>any</u> candidate in a union-financed newspaper, publication, or letter (Emphasis in original). The proscription against the use of union moneys to promote the candidacy of an individual is very strict.  See <u>Schultz v. Local Union 6799, UAW</u>, 426 F.2d 969, 972 (9th Cir. 1970), <u>*aff'd on other grounds, sub nom.*</u>, <u>Hodgson v. Local Union 6799, UAW</u>, 403 U.S. 333 (1971).  The prohibition includes any cost incurred by a union (or employer) or anything of value contributed by a union (or employer), to promote the candidacy of any individual in a union election.  <u>Marshall v. Local Union 20, Int'l Bd. Of Teamsters</u>, 611 F.2d 645, 652 (6th Cir. 1979); <u>See also</u>, <u>Donovan v. Local Union 70, Int'l Bhd. Of Teamsters</u>, 661 F.2d 1199, 1202 (9th Cir. 1982); <u>Usery v. Stove Furnace and Allied Appliance Workers</u>, 547 F.2d 1043, 1045 (8th Cir. 1977)(use of union funds to publish a report praising incumbent union officials a violation); <u>Marshall v. OPEIU, Local 2</u>, 505 F.Supp. at 123 (improper use of copier to make a one page flyer a violation); <u>Hodgson v. UMW</u>, 344 F.Supp. 17 (D.D.C. 1972) (use of union funds to purchase pens with an incumbent's name a violation). [7]

---

[7] No "de minimis" defense exists where improper use of union or employer funds has been demonstrated.  The statute clearly states that **"no moneys"**shall be applied for campaign purposes, and as one court has noted, "no money mean[s] no money."  <u>Marshall v. OPEIU</u>, 505 F.Supp. at 123 (duplication of 160 campaign flyers on employer's machine at a cost of $6.40 a violation).  Courts have recognized that the prohibition extends to the use of anything of value. "No moneys of section 401(g) has been interpreted to include anything of value in order to reflect Congress' intent that no illicit support of a candidate during a union election go unrecognized."  <u>McLaughlin v. American Federation of Musicians</u>, 700 F.Supp. 726, 737 (S.D.N.Y. 1988)(citing cases); <u>See Donovan v. Local Union 70, Teamsters</u>, 661 F.2d at 1202 (employer's trailers used to post candidate's campaign posters a violation); <u>Donovan v. Local 719 United Auto Workers</u>, 561. F.Supp 54 (N.D. Ill. 1982).

The defendant cannot overcome the Secretary's prima facie case by showing lack of bad faith, ignorance of the violations, etc., on the part of the union.  <u>See Donovan v. Local Union 70</u>, 661 F.2d at 1202.  The defendant may only rebut the prima facie case by bringing forward "tangible evidence" that the violation did not affect the result.  <u>Id</u>; see <u>Wirtz v. Hotel Employees</u>, 391 U.S.

Moreover, neither "good intentions," <u>Donovan v. National Alliance of Postal &</u> <u>Federal Employees</u>, 566 F.Supp. 529, 532 (D.D.C. 1983) (even the "best of motives" is of no consequence), <u>Usery v. Stove, Furnace Workers</u>, 547 F.2d at 1045, <u>see also</u>, <u>Reich v.</u> <u>Bottle Beer Drivers</u>, 869 F.Supp. at 1149; nor lack of knowledge excuses a violation of this section. <u>Donovan v. Local Union 70</u>, 661 F.2d at 1201-1202.

"[A]s a practical matter, incumbent officers must carry on business even in the midst of a heated election, including reporting to the membership on issues of general concern." <u>Chao v. North Jersey Area</u>, 211 F.Supp.2d at 551. Nevertheless, "once a candidacy is announced. . ., the newspaper must refrain from discrimination in favor or against any candidate." <u>Bliss v. Holmes</u>, 721 F.2d 156, 158 (6th Cir. 1983). "Considered under the totality of the circumstances, otherwise permissible statements may take on a different hue when viewed against the backdrop of an election campaign." <u>Dole v.</u> <u>Federation of Postal Police Officers</u>, 744 F.Supp. 413, 418 (E.D.N.Y. 1990).

Even actions undertaken by the union for a legitimate purpose are prohibited if "they enhance the candidacy of certain individuals and albeit subtly encourage the re-election of incumbents." <u>Brennan v. Sindicato Empleados de Equipo Pesado,</u> <u>Construccion Y Ramas Anexas de Puerto Rico, Inc.</u>, 370 F.Supp. 872, 878 (D.P.R. 1974) (newspaper ads and sponsorship of weather forecast mentioning names of candidates impermissible even absent any overt electioneering). The line between legitimate statements and impermissible support may be a fine one.[8] The statute "is only violated

---

at 506-07. As recent precedent makes clear, a union must prove that the violation "could not have affected the outcome of a given election." <u>Ellis v. Chao</u>, 336 F.3d 114, 120, 126 (2d Cir. 2003). The defendant's burden to show that the violation did not affect the outcome has been termed "very substantial." <u>Donovan v. Local 719</u>, 561 F.Supp. 54, 59 (N.D. Ill 1982).

[8] See <u>Yablonski v. United Mine Workers</u>, 305 F.Supp. 868, 871 (D.D.C. 1969)("so long as such coverage is addressed to the regular functions, policies and activities of such incumbents as

when the tone, content, and timing of the. . publications []. . .effectively encourage[s] and endorse[s] the re-election of [the incumbent]." <u>Donovan v. Metropolitan District Council of Carpenters</u>, 797 F.2d 140, 145 (3d Cir. 1986).

The undisputed facts further establish that Defendant failed to provide adequate safeguards to ensure a fair election by permitting the use of union funds to promote the candidacy of the incumbent President, in violation of 29 U.S.C. § 481(g). The cost of publication and distribution of the *Clan* is paid by union funds. The November-December 2003 issue of the *Clan* contained an "end of term report" written by Branch President Lind. Lind's term as President was scheduled to expire on March 31, 2004. The content of Lind's report was not a factual description of the accomplishments achieved during Lind's term, but mirrored the language and themes presented in campaign material issued by Lind for the election. The report criticized the prior administration, touted various of Lind's alleged accomplishments and promised future success with Lind as President. The report was issued some ten weeks prior to the end of Lind's term and published during the height of election campaigning, timed to introduce Lind's re-election campaign and platform. The content, tone and timing of the report constitute impermissible use of union funds to promote the candidacy of Lind.

There is nothing untoward about a branch President issuing an end of term report. The Constitution and Bylaws of Branch 34 require the President, at the end of his term, to issue a "report showing the progress and condition of the Branch." However**,** Lind's report was distributed to the membership well before the end of his term and just in time for the start of his election campaign, on January 14, 2004. Lind's report made numerous

---

officers involved in matters of interest to the membership, and not as candidates for reelection, there is no violation of [the LMRDA]").

characterizations of the administration that preceded his, provided an exceeding favorable view of his prowess as President, and adopted a tone of forward looking to his new term, with numerous references to what "I [Lind] will" or "we [the Lind-McMahon team] will" continue to do in the future. The timing, content and tone of the report is clearly campaigning rather than a factual account of the past, within the meaning of 29 U.S.C. 481(g).[9] Clearly, the Lind report is campaign material, distributed at Branch 34 expense in violation of 29 U.S.C. § 481(g).

## D.     Plaintiff is Entitled to an Order Requiring a New Election.

The LMRDA, 29 U.S.C. § 482(c), requires the district court to declare an election void and to order a new election under the Secretary's supervision if the Secretary proves that a violation of 29 U.S.C. § 481 "may have affected the outcome of the election;" see Wirtz v. Glass Bottle Blowers, 389 U.S. at 473-74. The Secretary is not required to establish that the violation did affect the election results.[10] Accordingly, courts have

---

[9] See Usery v. Stove, Furnace Workers, 547 F.2d at 1045; Chao v. North Jersey Area, 211 F.Supp.2d at 551; Compare Metzler v. Local 132, International Union of Operating Engineers, 1997 WL 155404 (S.D. W.Va. 1977)(no violation where union made express disclaimer of intent to influence election, document contained no derogatory reference to opposing candidates and statements made in document were objective in nature without discernable political overtones).

[10] The legislative history shows that the "may have affected" standard was selected in preference to more stringent language that would have required the Secretary to show that the violation "actually affected" the election's outcome. Wirtz v. Hotel Employees, 391 U.S. at 506-07. As Senator Goldwater explained during consideration of the amendment:

> The Kennedy-Ervin bill (S. 505), as introduced, authorized the court to declare an election void only if the violation of section 401 actually affected the outcome of the election rather than may have affected such outcome. The difficulty of providing such an actuality would be so great as to render the professed remedy practically worthless. Minority members in committee secured an amendment correcting this glaring defect and the amendment is contained in the conference report.

105 Cong. Rec. 19,765 (emphasis added).

understood the "may have affected the outcome" standard to be a "liberal" one.  <u>Marshall</u>
<u>v. American Postal Workers</u>, 486 F.2d at 82.  Once a violation has been established, the
Secretary has established a prima facie case that the violation "may have affected the
outcome of the election."  <u>Donovan v. Local Union 70</u>, 661 F.2d 202, quoting <u>Wirtz v.</u>
<u>Hotel Employees</u>, 391 U.S. at 506-07.  <u>See</u> <u>also</u>, <u>Reich v.Local 843, Bottle Beer Drivers</u>,
869 F.Supp. at 1150-511 (once plaintiff established a prima facie case that the "violation
may have affected the outcome of the election," the burden shifts to defendant to produce
"tangible evidence" that the violation did not influence the results).  So long as it is
possible that the violation may have affected the outcome of the election, the court should
nullify the election.  <u>Donovan v. Local 54</u>, 166 F.Supp.2d at 124; <u>See also</u>,  <u>Chao v. Local</u>
<u>538 United Food and Commercial Workers International Union</u>, 307 F.Supp.2d 1027,
1036  (W.D. Wis. 2004); <u>Dole v. Graphics Comm.</u>, 722 F. Supp. at 784, 786; <u>Dole v.</u>
<u>Local 492, Bakery, Confectionery and Tobacco Workers</u>, 1989 W.L. 126182, at *5 (E.D.
Pa. 1989); <u>Marshall v. American Postal Workers</u>, 486 F. Supp. at 82.

As set forth above, at least eighty-seven union members were not provided with
the opportunity to vote.  Since the margin of victory for the offices of President, Steward
and Trustee were decided by margins of less than eighty-seven votes, the failure "may
have affected" the outcome of the election.

With respect to the union funds violation, the President issued his supposed end of
term report at the outset of the election contest to the bulk of the membership.  The effect
of this mailing, under official auspices, cannot be limited to discrete offices, nor estimated
with precision.  The taint of the improperly-financed report should be remedied

by a re-run of all of the Branch 34 offices contested at that time.  See Local 54, 166

F.Supp.2d at 124; Donovan v. Local 119, International Union of Elec., Radio & Mach.

Wrkrs, 548 F. Supp 1004, 1005 (E.D. Pa. 1982).

    By establishing the Defendant's violations of 29 U.S.C. § 481 (e) and (g), the

Secretary has established a prima facie case that the violations "may have affected" the

outcome of the election.  Under the circumstances of this case, Defendant is unable to

rebut the presumption and a re-election of officers, under the supervision of the Secretary,

is required.

### V.  CONCLUSION

    For the foregoing reasons, Plaintiff requests that this Court enter summary

judgment in favor of Plaintiff and enter an Order:

    (1) Declaring Defendant's March 9, 2004, officer election null and void;

    (2) Directing the Defendant to conduct a new election under the supervision of the

Secretary, as soon as is reasonably possible;

    (3) Awarding the Secretary the costs of this action; and

    (4) Granting such other relief as may be appropriate.

                        Respectfully submitted,

                        MICHAEL J. SULLIVAN
                        United States Attorney


                        /s/Anita Johnson
                        ANITA JOHNSON
Of Counsel:             Assistant U.S. Attorney
Maureen L. Canavan      Moakley United States Courthouse
Attorney                One Courthouse Way - Suite 9200
Office of the Regional Solicitor    Boston, Mass. 02210
U.S. Department of Labor    (617)748-3282
JFK Federal Building, Room E-375
Boston, MA  02203

<u>Certificate of Service</u>

I hereby certify that I have served the foregoing upon counsel for Defendant, Wendy Bittner, 15 Court Square, Boston, Mass. 02109, by first class mail, postage prepaid, on this 20th day of April 2005.


/s/Anita Johnson