UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ELAINE L. CHAO, Secretary of Labor, United States Department of Labor, | ) ) ) | Civil Action No. 04-CV-12356-PBS |
| Plaintiff | ) ) ) |  |
| v. | ) ) |  |
| BRANCH NO. 34, NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO, | ) ) ) ) |  |
| Defendant | ) ) ) |  |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

Plaintiff Secretary of Labor ("Secretary") has brought suit against Defendant Branch 34 of the National Association of Letter Carriers ("Union") seeking to overturn the Union's 2004 election of officers.

Plaintiff alleges that 87 of the Union's 4,600 members did not receive ballots for the election and that the margin of victory in the race for President was 84 votes. Yet in fact only 79 members did not receive ballots, and five of these would not have received ballots even if the Union had attempted to mail them.

Plaintiff also characterizes the end-of-term report of the Union's President, Robert Lind, as union-subsidized campaign literature. Yet the report falls well within the bounds of

1

permissible reporting on his regular functions, policies and activities as President. Moreover, the instant suit was initiated by Edward Masiello, a former President of the Union who, in 2001, while running for re-election, published a far more partisan report that was condoned by the Department of Labor. Therefore, to overturn the most recent election at Masiello's request would create the appearance of government support of one candidate over another. If any remedy is necessary in this case, the court should exercise its discretion in equity to order supervision of the Union's next regularly-scheduled election, rather than overturning the 2004 election.

## II. SUMMARY OF FACTS

### A. The Union's 2001 Election of Officers

The Union has most recently held two regularly-scheduled elections of officers, in March, 2001 and March, 2004. Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue ("Pl.F.") 28, 50. In the instant suit, the Secretary of Labor ("Secretary") seeks to overturn the latter. Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Pl. Memorandum"), p. 21. The Secretary's actions are taken in response to a complaint by Edward Masiello. Pl.F. 87-89, 99-100. Masiello was the incumbent President prior to the March, 2001 elections. Defendant's Statement of Material Facts as to Which There Is No Genuine Issue ("D.F.") 3. For the 2001 elections he formed a slate called the "Masiello-Celeste Team." *Id.* There was no formal opposition slate to the Masiello-Celeste Team, but a number of independent candidates ran for office and most of them cooperated informally with each other. D.F. 4-6. The independent candidate for president was Robert Lind. *Id.*

Masiello published an end-of-term report in an issue of the Union's newspaper, the *CLAN*, which was timed to arrive at members' homes at almost exactly the same time as did the ballots for the 2001 elections. D.F. 7-8. Masiello's end-of-term report explicitly asked members to support him. D.F. 12-13. A graphic abutting the report on the front page reminded readers to vote in the upcoming election. *Id.* The report concluded, "We will continue to represent all of our members in a way that benefits **YOU!** I want to thank you all for supporting my administration in all that we do." *Id.* (emphasis in original).

In addition, Masiello's report repeatedly and explicitly reminded readers of his campaign promises from the previous (1998) election and repeatedly claimed they had been fulfilled. D.F. 9. Masiello's. Finally, it implied that others in the Union had embezzled Union funds. D.F. 10.

Lind beat Masiello in the 2001 election, but he was the only independent candidate running for major office to prevail. D.F. 3, 5, 14, Table 1. The Masiello slate won twelve of sixteen positions.[1] *Id*. Thus, Lind took office together with a Masiello-aligned administration.

Kelley O'Shea, the losing independent candidate for Executive Vice President, filed complaints with both The National Association of Letter Carriers ("NALC") and the Department of Labor about the result of her and other elections. D.F. 15-24. Her complaint contained allegations nearly identical to those in this case: that Masiello's end-of-term report was Union-financed campaign literature, and that the Union erred in using a mailing list maintained by Murdock Mailing Co. to distribute ballots. D.F. 16.

While her complaint was pending at the Department of Labor, NALC overturned only the election in which O'Shea had run, and on grounds unrelated to the end-of-term report or mailing

---

[1] Three independent candidates won entry-level positions, although only two of these had actively cooperated with other independents. *Id*.

3

list. D.F. 20-21. NALC refused to rule on either of these allegations, and it refused to overturn any election other than that of O'Shea. *Id*.

The Department of Labor then deferred to the NALC ruling and dismissed O'Shea's complaint in its entirety, not only with respect to her election. D.F. 23-24. The Department of Labor specifically held that no violation had occurred in the race for Secretary Treasurer. *Id*. Yet the winning candidate in that race, David Fitzgerald, had been praised by name in Masiello's end-of-term report about which O'Shea had complained. *Id*.

**B.      The 2004 Election**

Almost all of the Union's incumbent officers prior to the 2004 elections had originally run as Masiello supporters. D.F. 27-30, Table 2. Yet when Lind and Masiello announced their slates on nomination night, in mid-January, 2004, seven candidates had changed affiliation. D.F. 25-33, Table 2.

In addition, in three races, the incumbent ran for re-election on the Masiello slate, and in four other races there was no incumbent for that position, but the Masiello candidate had the same or greater affiliation with the incumbent administration as did the Lind candidate.[2] *Id*. Thus, many Lind candidates were affiliated with the previous Masiello administration, and many Masiello candidates were affiliated with the incumbent Lind administration. *Id*.

As required by the Union's Constitution, President Lind published an end-of-term report for his 2004 term. Pl.F. 10, 48. Unlike Masiello, President Lind published his report in the November-December 2003 issue of the *CLAN* rather than timing it to arrive with the ballots in mid-February. *Id.*; D.F. 7, 35. Lind's report made no reference to the election, nor did it ask

---

[2] That is, either the Masiello candidate currently held a different elected position and the Lind candidate did not, or both had the same status. *Id*.

4

readers to support him. D.F. 36. It discussed over a dozen substantive issues including the financial condition of the Union, contract disputes over the classification of employees, the Union's legislative activities, and its charitable work. D.F. 37-38, Table 3. The tone of the *CLAN* is typically quite fiery, as was most of the end-of-term report, but its tone was softer when discussing issues implicating the former administration. D.F. 39-45.

The Union followed the same practices it had used for many years in distributing ballots for the 2004 election. D.F. 46-55. The Union's mailing list ("Murdock Mailing list") is maintained by Murdock Mailing Co. D.F. 47. Judith Hall, the Union's Administrative Assistant, provides updates to Murdock Mailing on a continual basis. *Id.* Although Hall is extremely thorough in searching for members whose addresses have changed, on rare occasions, Hall is unsuccessful in tracking down a member whose mail is being returned as undeliverable. In such cases she tells Murdock Mailing to remove that member from the list. D.F. 48-49. In addition to mailing out ballots, the Union undertook a substantial publicity effort to inform members of the 2004 election and to encourage them to request a ballots if they did not receive them. D.F. 52-55. The Union mailed a ballot to every member who requested one. D.F. 55.

As members began requesting ballots, Hall realized that Murdock Mailing had dropped some names from its list. D.F. 56. Hall had not requested that these names be dropped, and Murdock Mailing attributed their removal to a computer error. *Id*.

President Lind was reelected by a margin of 84 votes over former President Masiello. Pl.F. 86. Masiello filed a complaint with the Department of Labor, and the Office of Labor Management Standards assigned a team to investigate the election. D.F. 99-100. They compiled a list of 145 individuals ("OLMS list") whose names appeared on the NALC eligibility list but not on the Murdock Mailing list used to send out ballots. Pl.F. 101-10; D.F. 58-64. Of these, the

5

OLMS list recorded 58 as having requested a ballot, but it failed to record an additional six members who also requested ballots. Pl.F. 109; D.F. 65-66. In addition, two of the individuals recorded on the OLMS list as not having received ballots were not Union members at the time of the election. D.F. 67-69. When these errors are taken into account, only 79 eligible members did not receive ballots. D.F. 70. Moreover, there was no valid address available for five of these 79 members, and one was also incapacitated and another, in jail. D.F. 71-77.

### III. ARGUMENT

### A. Applicable Legal Standard

The election provisions of the Labor Management Reporting and Disclosure Act ("LMRDA" or "Act") were enacted to protect union members' rights to self-determination though the free and democratic election of their union officers. 29 U.S.C. §§ 481-485; *Harrington v. Chao*, 280 F.3d 50, 52-53 (1st Cir. 2002); *Marshall v. Local 1010, United Steelworkers of America, AFL-CIO*, 664 F.2d 144, 150 (7th Cir. 1981). To do this, it carefully balances two principles. *Id.* The first is that effective government intervention is at times necessary to prevent electoral abuses by "entrenched" incumbents and to ensure that opposition candidates are able to participate freely and effectively in the electoral process. *Id.*. The second is that such government intervention in the electoral process must be minimized to ensure genuine union self-determination. *Id.*

The Act places procedural limits on the "inherently disruptive" remedy of overturning a union election. *Steelworkers Local 1010*, 664 F.2d at 150.

> The legislative history shows that Congress weighed how best to legislate against revealed abuses in union elections without departing needlessly from its long-standing policy against unnecessary governmental intrusion into internal union affairs. The extensive and vigorous debate over Title IV manifested a conflict

6

> over the extent to which governmental intervention in this most crucial aspect of union affairs was necessary or desirable. In the end there emerged a general congressional policy to allow unions great latitude in resolving their own internal controversies, and where that fails, to utilize the agencies of Government most familiar with union problems to aid in bringing about a settlement through discussion before resort to the courts.

*Boilermakers Local 647*, 876 F.2d at 652 quoting *Wirtz v. Local 153, Glass Bottle Blowers Ass'n*, 389 U.S. 463, 470-71 (1968)(further internal quotations omitted). In addition to these exhaustion requirements, the Act provides that a violation can not serve as grounds for overturning an election unless it could have affected the results. 29 U.S.C. § 482; *Reich v. District Lodge 720, International Association of Machinists and Aerospace Workers, AFL-CIO*, 11 F.3d 1496, 1499 (9th Cir. 1993). Finally, it provides the courts with the discretion in equity not to overturn an election. *McLaughlin v. Lodge 647, International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL-CIO*, 876 F.2d 648, 651-52 (8th Cir. 1989); *Steelworkers Local 1010*, 664 F.2d at 150-51.

The Secretary alleges two violations of the LMRDA occurred in the Union's 2004 elections. Pl. Memorandum, p. 1. First, she alleges that eligible voters were missing from the mailing list used to mail out ballots. *Id*. Yet the number of missing addresses was too few to affect the outcome of the election. Second, the Secretary alleges that an end-of-term report by President Lind constituted impermissible Union-funded campaign literature. *Id*. An analysis of the case law in this area shows that the end-of-term report was a permissible publication addressed to Lind's "regular functions, policies and activities" as President of the Union. *Donovan v. Metropolitan District Council of Carpenters*, 797 F.2d 140, 146 (3rd Cir. 1986). Moreover, to overturn Lind's election because of the report would create the unfortunate appearance that the government favors one candidate over another because the Department of

Labor condoned a far more partisan report issued in 2001 by former President Masiello who initiated the instant case.

**B.     Too few names were dropped from the Union's mailing list to affect the outcome of the election.**

A violation of the LMRDA can serve as grounds for overturning an election only if it "may have affected the results of the election." 29 U.S.C. § 482; *Reich v. District Lodge 720, International Association of Machinists and Aerospace Workers, AFL-CIO*, 11 F.3d 1496, 1499 (9th Cir. 1993). A union election will not be overturned because a number of members less than the margin of victory did not receive ballots. *Id.* at 1502-03. Nor can the failure to mail ballots to addresses a union knows to be invalid serve as grounds for overturning an election, as sending out undeliverable mail could not possibly affect the results of an election. *Id.* Finally, a union election can not be overturned on the basis of errors in the union's address list where the union can show that it made reasonable efforts to keep its mailing list current and accurate. *Id.* at 1501-02.

There is no genuine dispute about the fact that only 79 eligible voters did not receive ballots for the 2004 election, whereas Lind won by a margin of 84 votes. Pl. 86; D.F. 70. The Secretary relies entirely on an affidavit by OLMS investigator Kerry McEntee which states that there were 145 Union members missing from the Murdock Mailing list of whom 87 never received a ballot.[3] Pl.F. 73-76, 101-12. The Union has entered into the record the list created by the OLMS of these individuals. D.F. 64-65, Defendant Exhibit 14. It has also entered records

---

[3] McEntee's statement would be inadmissible at trial under Federal Rules of Evidence 1002 and 1004. McEntee did not personally compare the entire 4,600-name Murdock Mailing list with the NALC list – this was a task performed by three members of his investigatory team over roughly two days. Pl.F. 73-76, 101-10; D.F. 58-64. McEntee's knowledge of the number of missing names is based entirely on his having seen and worked with the OLMS list. *Id.* Thus, his statement is being used to prove the contents of the OLMS list in lieu of the OLMS list itself.

8

showing that six of the 87 individuals listed as not receiving ballots in fact requested and were mailed ballots, as well as records showing that another two were not members of the Union at the time of the election. D.F. 66-69, Defendant Exhibits 15-18, 20.

In addition, five of the members left off the Murdock Mailing list were removed at Hall's request because mail sent to their last known addresses was repeatedly returned, and Hall's thorough efforts had not produced a new address for them. D.F. 71-77. One of these individuals was incapacitated; another was in jail and had been fired, by the Post Office, in part, for failing to provide an address where he could reached. *Id*. Attempting to mail a ballot to these five individuals would have been futile, and the failure to do so could not have affected the results of the election. *Machinists District Lodge 720*, 11 F.3d at 1502-03.

Finally, the Union's efforts to keep its mailing list accurate and up-to-date were exhaustive. D.F. 47-49, 51-55. Hall routinely sought new addresses from the Post Office, telephone book, calls to members and from NALC, which generated the list upon which the Secretary relies. *Id.* The Union also publicized the election and invited members to request ballots through announcements in the branch and NALC newspapers, through multiple postings in every worksite, and through announcements at Union and workplace meetings. *Id*.

Since the Union made extensive outreach efforts, and since only 74 additional members could have been reached by the measures proposed by the Secretary, whereas the margin of victory was 84 votes, the election should not be overturned. *Machinists District Lodge 720*, 11 F.3d at 1501-03.

**C.     President Lind's end-of-term report was "addressed to [his] regular functions, policies and activities" as President of the Union.**

*1.     The question before the court is whether Lind's end-of-term report was addressed to his regular functions, policies and activities as President.*

Section 401(g) of the LMRDA provides:

> No moneys received by any labor organization . . . shall be contributed or applied to promote the candidacy of any person in any election subject to the provisions of this subchapter. Such moneys . . . may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.

29 U.S.C. § 481(g).

Allegations that a union has violated Section 401(g) commonly fall into three categories. *Compare Donovan v. Local Union 70, Int'l Bhd. of Teamsters*, 661 F.2d 1199 (9th Cir. 1982) *with Bliss v. Holmes*, 721 F.2d 156 (6th Cir. 1983) *and Dole v. Federation of Postal Police Officers*, 744. F. Supp. 413, 421 (E.D.N.Y. 1990). The first is an allegation that the union or an employer has financed explicit campaign material, such as an explicit endorsement of a candidate. *See, e.g. Teamsters Local 70*, 661 F.2d 1199. Many of the cases cited by the Secretary involve this type of allegation.[4] In such cases the main dispute often centers on the amount or directness of the union's or employer's support. *Id.* It is on this issue that "the proscription against the use of union moneys to promote the candidacy of an individual is very strict," as argued by the Secretary.[5] Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Secretary's Memorandum"), p. 16.

---

[4] Specifically, in order of appearance beginning on page 16 of the Secretary's Memorandum: *Schultz v. Local Union 6799, United Steelworkers of America*, 426 F.2d 969 (9th Cir. 1970)(use of union equipment for campaign); *Marshall v. Local Union 20, Int'l Bd. of Teamsters*, 611 F.2d 645 (6th Cir. 1979)(employer contribution); *Donovan v. Local Union 70, Int'l Bhd. of Teamsters*, 661 F.2d 1199 (9th Cir. 1982)(unauthorized use of employer trailers for campaign posters); *Usery v. Stove Furnace and Allied Appliance Workers*, 547 F.2d 1043 (8th Cir. 1977)(outgoing officer not only praised other incumbent officials but explicitly endorsed them); *Marshall v. OPEIU, Local 2*, 505 F.Supp. 121 (D.D.C. 1981)(employer's copier used to produce campaign fliers).

[5] *Id.* For example, *Schultz v. Local 6799, USWA*, cited by the Secretary in support of this proposition, held that a union could not allow a candidate to make any use at all of union equipment for campaign purposes.

10

The second common type of allegation is that the overall pattern of news coverage in a union's newspaper unfairly emphasizes certain candidates and shuts out others. *See, e.g. Bliss v. Holmes*, 721 F.2d 156 (6th Cir. 1983).[6]  There is no such allegation in this case.

The third type of allegation is that particular union publications, while ostensibly covering "newsworthy items relating to union and union-related activities . . . become so excessive as to render [them] prohibited campaign literature. *Dole v. Federation of Postal Police Officers*, 744. F. Supp. 413, 421 (E.D.N.Y. 1990).  It is this type of allegation that the Secretary makes in this case.  Pl. Memorandum, pp. 18-19.

The Act allows unions to communicate factual information concerning union affairs to their members.  29 U.S.C. § 482(g).  "Incumbent officials must carry on business even in the midst of a heated election, including reporting to the membership on issues of general concern." *Chao v. North Jersey Area Local Postal Workers Union*, 211 F.Supp.2d 543, 551 (D.N.J. 2002). "In deciding whether a given act constitutes campaigning, we must be mindful of the union's need for free and open discussion if it is to govern itself effectively." *Donovan v. Metropolitan District Council of Carpenters*, 797 F.2d 140, 145 (3rd Cir. 1986).

The question to be answered by the court in considering the permissibility of a particular union communication is whether "considered as a whole [it is] addressed to the regular functions, policies and activities of such incumbents as officers involved in matters of interest to the membership, and not as candidates for reelection," *id.* at 146, or whether it has "become so excessive as to render it prohibited campaign literature," *Federation of Postal Police Officers*, 744 F.Supp. at 421.  In answering this question, courts consider the content, timing, and tone of

---

[6] Other cases cited by the Secretary involving this type of allegation include *Hodgson v. United Mine Workers of America*, 344 F.Supp. 17, 22-23 (D.D.C. 1972)(coverage of officer ceased abruptly when he became a candidate) and *Yablonski v. United Mine Workers of America*, 305 F.Supp. 868, 874 (D.D.C. 1969)(additional allegations discussed below).

11

the publication as well as the broader factual context. *Metropolitan District Council of Carpenters*, 797 F.2d at 145-46.

> 2.  It is not enough that Lind's end-of-term report reflected well on the current administration or poorly on the previous one.

An examination of the cases cited by the Secretary concerning this distinction shows that union publications do not become campaign literature merely because they reflect well on one candidate or poorly on another; rather the publication must solicit reader support for one candidate or unnecessarily malign another. *Metropolitan District of Carpetners*, 797 F.2d at 145-146; *Federation of Postal Police Officers*, 744 F.Supp. at 415-16, 420-21.

For example, *Federation of Postal Police Officers* found a publication quite similar to Lind's end-of-term report to be permissible. *Id.* In that case, the publication at issue discussed how the union's financial position had improved over that under the previous administration, praised the high success rate the union had had in grievances since its president and vice president took office, and stated that one goal would be achieved by a certain date if the incumbent president and vice president remained in office. *Id.* at 415-16. The same publication also made a "patently derogatory" comment concerning the secretary-treasurer's competency. *Id.* at 415, 420. The court held that only the race for secretary-treasurer should be re-run, as the discussion of the president's and vice president's improvements over the previous administration were permissible "coverage of newsworthy items relating to union and union-related activities." *Id.* at 421.

Likewise, *Metropolitan District of Carpenters* held that published statements concerning a lawsuit and use of a non-union bulk mailer were permissible even though

> neither man hid his views about the upcoming election, and . . . certain of their statements, taken in isolation, more or less subtly attacked the insurgent McCloskey. Considered as a whole, however, both sets of remarks were addressed to the regular functions, policies and activities of such incumbents as

12

> officers involved in matters of interest to the membership, and not as candidates for reelection.

*Donovan v. Metropolitan District of Carpenters*, 797 F.2d at 146 (internal quotations omitted). Only when the union re-distributed the statements with additional, gratuitous material criticizing the insurgent did they become an impermissible "campaign tool." *Id.* at 146.

In the other cases the Secretary cites, Union publications become campaign material only when they were needlessly derogatory towards opponents or strongly hinted that a vote is requested.[7]

    3.    *President Lind's report addressed Union news items of concern to the membership rather than unfairly maligning other candidates or soliciting votes.*

The 2004 end-of-term report by President Lind, considered as a whole, was addressed to his regular functions, policies and activities as President, and thus it was a permissible Union communication. *Metropolitan District Council of Carpenters*, 797 F.2d at 146. It made no reference to the election, discussed substantive issues of concern to the membership, and softened its tone when discussing issues which indirectly implicated other candidates.

First, the Lind end-of-term report makes no references to the upcoming election. Nor is there any mention of the upcoming election on the same page as the report.[8] D.F. 36. The report's few references to the future, with no reference to the elections, do not approach the requests for votes which have been found to violate the Act. *Contrast Federation of Postal*

---

[7] *Chao v. North Jersey Area Local Postal Workers*, 211 F.Supp.2d 543, 552 (D.N.J. 2002)(union departed from past practice to publicize candidate's vote for dues increase and needlessly implied that she used illegal drugs); *Donovan v. National Alliance of Postal and Federal Employees*, 566 F.Supp. 529, 531 (D.D.C. 1983)(newspaper praised incumbents as dedicated officers and repeatedly stated that it would be up to voters in the upcoming election whether the progress of recent years would continue); *Donovan v. Local 719, United Automobile, Aerospace and Agricultural Implement Workers of America*, 561 F.Supp. 54, 58 (E.D. Ill. 1982)(statements by opposition candidates were "LIES"); *Brennan v. Sindicato Empleados de Equipo Pesado, Construccion Y Ramas Anexas de Puerto Rico*, 370 F.Supp. 872, 876-77 (D.P.R. 1974)(union engaged in multiple violations, including radio sponsorships repeatedly reminding listeners of the president's leadership and the upcoming election); *Hodgson v. United Mine Workers of America*, 344 F.Supp. 17, 22-23 (D.D.C. 1972)(union published song praising incumbents to be sung to the tune of *Hello Dolly* and distributed free pens together with campaign literature).
[8] The issue of the *CLAN* in which the report was published, as did the two before, contained an announcement of the election. Pl. 47

*Police Officers*, 744 F.Supp. at 415-16 *with National Alliance of Postal and Federal Employees*, 566 F.Supp. at 531.

The report absolutely addresses newsworthy items relating to the Union of interest to the Union's membership. *Federation of Postal Police Officers*, 744 F.Supp. at 421. It is a lengthy and detailed discussion of over a dozen substantive issues ranging from the reallocation of positions among different job titles, to the financial condition of the Union, to its legislative and charitable activities. D.F. 37-38, Table 3. All of these issues had been covered in the *CLAN* during Lind's term of office, usually repeatedly. *Id*. In addition, President Lind was required by the Union Constitution to report to the membership on his activities during his term. Pl.F. 10.

The report also softens its tone when discussing issues implicating other candidates. D.F. 39-45. While any discussion of the developments under one president implies a contrast with the president before, this is insufficient to render the discussion campaign literature, even if the contrast is made explicit. *Federation of Postal Police Officers*, 744 F.Supp. at 421. When the report's treatment of these issues is compared with its overall tone, and that of the *CLAN* as a whole, it can be seen that the author avoided needlessly derogatory language towards the previous administration.

For example, the 2004 end-of-term report calls one management decision a "fiasco" and one of many "attack[s]" which were "orchestrated" by an administrative office which "seized control" of the Boston district. D.F. 39. It says that the Union attempted to negotiate with management, but "it takes two willing parties to sit at the table. Only one was present, Branch 34. Management's offer was an insult to the letter carrier craft." *Id.*

Other articles in the same and previous issues of the *CLAN* are similarly strongly worded. D.F. 40-43. For example, immediately adjacent to the last page of the end-of-term report is an

article entitled, "Stop the Psychotic Super!" which states that there are enough supervisors who "get[] a *natural HIGH* out of aggravating letter carriers" in the Boston area "to fill a psychiatric ward." D.F. 41 (emphasis in original). In this no-holds-barred context, the end-of-term report would not come across to readers as particularly critical of the previous administration.

   4. *Nearly all of the incumbents in the Lind administration ran with Masiello in 2001, 2004 or both.*

Since Lind's end-of-term report does not directly praise or criticize any candidate, or even mention the election, the Secretary relies entirely on the theory that it promotes the Lind slate by contrasting an incumbent administration of Lind supporters with a previous, different Masiello administration.[9] Pl. Memorandum, pp. 18-19. Yet the facts at the time of the report's publication undermine this argument.

The incumbents in 2004 were, in fact, almost all members of the previous Masiello administration – Masiello candidates had won twelve of sixteen races in 2001. D.F. 3, 14, 30, Table 1. Seven candidates had switched affiliation between 2001 and January, 2004. D.F. 27-33, Table 2. Thus, to criticize the Masiello administration would be to criticize the bulk of the officers of the Lind administration as well, including many of the candidates on his slate. *Id*.

In addition, many members of the incumbent administration ran with the Masiello slate in 2004 as they had in 2001. D.F. 30-33, Table 2. In seven races in the 2004 election, the Masiello candidate was as much or more an incumbent than the Lind candidate. *Id.* In these races, praise of the incumbent administration would have been praise of the Masiello candidate. *Id.*

---

[9] For example, the Secretary equates the word "we" as used in the end-of-term report with "the Lind-McMahon team" despite the fact that the report makes no reference whatsoever to the Lind-McMahon Team. *Contrast* Pl. Memorandum, p. 19 *with* Plaintiff Exhibit 10, pp. 1, 2, 6.

Thus, the Secretary is incorrect to equate the incumbent administration with the Lind slate or to suggest that Lind could improve his slate's chances by criticizing the Masiello administration with which many of them had been affiliated.

**D.     The Court should exercise its discretion in equity not to void the 2004 election.**

The Secretary has requested that this court void some or all of the Defendant's most recent officer elections and order that new, special elections be held to fill the vacated offices.[10] Yet when Masiello, the very candidate whose complaint the Secretary is pursuing, ran for re-election in 2001, he engaged in the conduct of which he now complains, and the Secretary refused to take action to remedy them. Therefore, Masiello is precluded by the doctrine of unclean hands from seeking a special election, and ordering one would have the effect of inappropriately favoring one candidate over another. If this honorable court should find that a remedy is appropriate in this case, it should exercise its discretion in equity not to void the 2004 elections, but to order supervision of the next regularly scheduled election.

It is widely recognized that "a suit under § 482 of the LMRDA seeking . . . to set aside a union election is essentially an equitable proceeding and is therefore governed by equitable principles." *Marshall v. Local 1010, United Steelworkers of America, AFL-CIO*, 664 F.2d 144, 149 (7th Cir. 1981) *citing Usery v. International Organization of Master, Mates and Pilots*, 538 F.2d 946 (2d Cir. 1976); *see also Stewart v. Baltimore Teachers Union*, 243 F. Supp. 377, 379 (D. Md. 2003)(listing cases). "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case." *Id. quoting Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944).

---

[10] In her Complaint, the Secretary asked that every election in which a candidate from the Lind slate prevailed be voided. *Compare* Remedy Requested in Plaintiff's Complaint *with* D.F. Table 2. In her Motion for Summary Judgment she appears to ask that all elections be voided. Pl. Memorandum, p. 21.

16

Congress specifically intended the courts' discretion in equity to serve as a check against inappropriate government interference in the free choice of union leaders by their members. *McLaughlin v. Lodge 647, International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL-CIO*, 876 F.2d 648, 651-55 (8th Cir. 1989; *Dole v. Local Union 226, Hotel & Restaurant Employees*, 718 F.Supp. 1479, 1485 (D. Nev. 1989). The Senate Report recommending passage of the LMRDA cautioned that "in providing remedies for existing evils the Senate should be careful [not] to undermine self-government within the labor movement." *Hotel and Restaurant Employees Local 226, Hotel & Restaurant Employees*, 718 F.Supp. at 1485 (bracketed material in original) *quoting* S. Rep. No. 187, 86th Cong., 1st Sess. 4, *reprinted in* 1959 U.S. Code Cong. & Admin. News 2318, 2322. In passing the LMRDA, Congress also emphasized that "the legislation should provide an administrative or judicial remedy for each specific problem." *Boilermakers Lodge 647*, 876 F.2d at 652 *quoting* S. Rep. No. 187. Thus, Congress "bestowed district courts with the power, albeit equitable, to balance the union's desire for self-government and the need for governmental intrusion." *Id.*

The courts have exercised this discretion in a number of circumstances to ensure that "the remedies provided [are] applied in the spirit in which they were created." *Steelworkers Local 1010*, 664 F.2d at 150. Two circuit courts have applied the principle of unclean hands to deny the Secretary a supervised election where a new election would benefit candidates who had violated the act. *Id.* at 151-52; *Donovan v. Local 6, Washington Teachers' Union, AFL-CIO*, 241 U.S. App. D.C. 274, 747 F.2d 711, 716-17 (D.C. Cir. 1984); *see also Dole v. Local 512, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO*, 730 F.Supp. 1562, 1567-68 (M.D. Fla. 1990). Another held that a district court had the discretion to deny any relief where the defendant union had already obtained independent

supervision of its next regularly scheduled election.  *Boilermakers Lodge 647*, 876 F.2d at 654-55.  Denial of relief is also appropriate where the complaining party was offered and refused the opportunity to remedy the electoral problem complained of.  *Stewart v. Baltimore Teachers Union*, 243 F. Supp. at 379.

      The exercise of the court's discretion in equity is necessary in this case to prevent selective government intervention which gives the appearance of favoring one candidate over another.  When President Masiello ran for re-election against Lind in 2001, he published an end-of-term report far more problematic than that of which he now complains.  D.F. 7-13.  Masiello urged voters to support him and made references to the electoral process, strong indications of campaign literature.  *Id.*; *Donovan v. National Alliance of Postal and Federal* Employees, 566 F.Supp. 529, 531 (D.D.C. 1983).  It implied that other Union officers had embezzled Union funds.  D.F. 10.  Finally, Masiello had his report published in an issue of the *CLAN* timed to arrive at members' homes at exactly the same time as the ballots.  D.F. 7.

      Kelley O'Shea, one of the independent candidates running against the Masiello slate filed timely complaints with the Department of Labor and NALC about the result of her and other elections.  D.F. 15-24.  O'Shea's report specifically alleged that the Masiello end-of-term report constituted Union-financed campaign literature and that the Union erred in using the Murdock Mailing list to distribute ballots instead of the NALC eligibility list.  D.F. 16-18.  Because these allegations were contained within O'Shea's internal appeal to NALC, the Department of Labor was required to pursue them if they had merit.  *Harrington v. Chao*, 280 F.3d 50, 56 (1st Cir. 2002).  In addition to discussing violations affecting all races, O'Shea specifically discussed the independent candidate for Secretary-Treasurer, Michael Yerkes, whose opponent, David Fitzgerald, had been named and praised in Masiello's end-of-term report.  Therefore, the

Secretary was required to pursue any violations which had affected any of the 2001 elections. *Donovan v. Air Transport, District Lodge 146 International Association of Machinists*, 754 F.2d 621, 627 (8th Cir. 1985).

The Department of Labor dismissed O'Shea's complaint in its entirety, even though only the race for Executive Vice President was re-run. D.F. 20-24. It deferred to NALC's ruling even though NALC refused to consider legality of the end-of-term report. *Id.* Indeed, the Department of Labor explicitly held that there had been no violation in the race for Secretary Treasurer in which Masiello's report praised one candidate. *Id*.

Now Masiello asks that Lind's election be voided because Lind published an end-of-term report much milder than that published by Masiello. Pl.F. 89; D.F. 8-13, 34-39. In addition, he cites the same ballot-mailing practices which the Union used under his leadership. Pl.F. 88, D.F. 46-51. His request should be denied under the doctrine of unclean hands. *Steelworkers Local 1010,* 664 F.2d at 150; *Stewart v. Baltimore Teachers Union*, 243 F. Supp. at 379.

Moreover, should Masiello's request be granted, the effect will be that the government punishes one candidate while condoning the same and worse behavior by his opponent, creating the appearance that the government favors one candidate over another. Such a seeming endorsement is exactly the sort of interference with union self-determination that the drafters of the LMRDA worked so hard to avoid. *See, e.g. Boilermakers Lodge 647*, 876 F.2d at 652.

For these reasons, should the court find that some remedy is necessary in this case, it should exercise its discretion in equity to fashion one that preserves the neutrality and fairness required by the Act. Requiring supervision of the next regularly scheduled election will allow the Department of Labor to ensure any change that is required in the Union's long-standing election practices, and it will do so in a way that does not unfairly favor any candidate.

Supervision of the next regularly scheduled election is an appropriate remedy for alleged long-standing flaws in a Union's election practices. *Hotel and Restaurant Employees Local 226*, 718 F.Supp. at 1486. Therefore, the court should apply the doctrine of unclean hands to deny Masiello's attempt to void the 2004 elections.

### IV. CONCLUSION

For the reasons stated herein, Defendant respectfully requests that Plaintiff's Complaint be DISMISSED in its entirety.

Respectfully Submitted,

BRANCH NO. 34, NATIONAL ASSOCIATION
OF LETTER CARRIERS, AFL-CIO

/s/ Wendy M. Bittner
Catherine A. Highet, BBO #657407
Wendy M. Bittner, BBO #044100
Law Offices of Wendy Bittner
15 Court Square, Suite 300
Boston, MA 02108
(617) 624-0200

Date: June 2, 2005

### Certificate of Service

I hereby certify that I have served the foregoing upon counsel for Plaintiff, Assistant U.S. Attorney Anita Johnson, Moakley United States Courthouse, Ste. 9200, Office of the Regional Solicitor Boston, Mass. 02210, by first class mail, postage prepaid, on this day, June 2, 2005.

/s/ Wendy Bittner
Law Offices of Wendy M. Bittner