UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELAINE L. CHAO, Secretary of Labor, United States Department of Labor,<br><br>        Plaintiff<br><br>v.<br><br>BRANCH NO. 34, NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO,<br><br>        Defendant | Civil Action No. 04-CV-12356-PBS |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 56.1 of the United States District Court, District of Massachusetts, Defendant Branch No. 34, National Association of Letter Carriers, AFL-CIO, submits the following undisputed facts, including references to the record.

**The 2001 Branch 34 Election**

1.    Branch 34 ("Union") conducted a regularly scheduled election of union officers in March, 2001. Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue ("Pl.F.") 28.

2.  Table 1 lists all of the candidates in the 2001 election and notes the winner for each office. Exhibits 2 and 3 to Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("D. Ex."); Affidavit of Robert Lind, D. Ex. 1, at ¶¶ 2-13 ("Lind Aff. 2-13").

3.  Incumbent President Ed Masiello, incumbent Executive Vice President Fred Celeste, and other candidates formed a slate for the 2001 election called the "Masiello-Celeste Team." Table 1 indicates which candidates were part of that slate. D. Ex. 2; Lind Aff. 4-5 (D. Ex. 1).

**Table 1**

| Office Sought | Candidate | Masiello Slate | Winner |
|---|---|---|---|
| President | Robert Lind | | Y |
| | Ed Masiello | Y | |
| Executive Vice President | Fred Celeste | Y | Y |
| | Kelley O'Shea | | |
| Vice President | John T. McMahon | Y | Y |
| | John Fanning | | |
| Secretary-Treasurer | Dave Fitzgerald | Y | Y |
| | Mike Yerkes | | |
| Financial Secretary | Pat Terrazzano | Y | Y |
| | Ed Killion | | |
| Editor – Clan | Maureen Marinelli | Y | Y |
| | Bob Damatin | | |
| | Tony Scrivano | | |
| Sergeant-At-Arms | Vigo Conte | Y | Y |
| Clerk MBA-NSBA | Mary Papa | Y | Y |
| Health Benefit Officer | Ed Ahstedt | Y | Y |
| Trustees (3) | Bob Simpson | Y | Y |
| | Mitch Hilton | Y | Y |
| | Donna Newman | | Y |
| | Bob Tremarche | Y | |
| | Maureen Siple | | |
| | Veronica Bertrand | | |
| Area Stewards (4) | Mike McCormack | Y | Y |
| | Kevin Flaherty | | Y |
| | Kevin Mulligan | | Y |
| | Keith Meredith | Y | Y |
| | Bob Meaney | | |
| | Tom Conville | Y | |

2

4.      There was no formal opposition slate to the Masiello slate. However, a number of candidates ran as independents against the Masiello candidates. A number of the independent candidates supported each other on an informal basis. Lind Aff. 6-9 (D. Ex. 1).

5.      This informal support included attending fundraisers held by other independent candidates and appearing together at worksites to campaign. Candidates who supported each other in this way included Robert Lind, Mike Yerkes, Kevin Flaherty, Kevin Mulligan, Robert Meaney, John Fanning, and Kelley O'Shea. *Id.*

6.      Many Union members were aware of this informal cooperation. *Id.*

7.      President Masiello's end-of-term report was published in the January, 2001 issue of the Union's newspaper, the *CLAN*. It was timed to arrive at members homes within a few days of when the ballots for the 2001 election did. D. Ex. 4; Lind Aff. 10-12 (D. Ex. 1).

8.      Masiello's end-of-term report took up the entire first page of the *CLAN* as well as part of the third page. *Id.*

9.      Masiello's report repeatedly set out the promises which it stated he had made during the previous (1998) campaign and repeatedly stated that Masiello had kept these promises. *Id.*

10.     Masiello's report stated that after the changes he made, union credit cards were now used "strictly for business purposes" rather than "hidden expenses," thus "saving this Branch thousands of dollars in unnecessary expenses." *Id.* Masiello had used accusations of credit card misuse in his 1998 election campaigns. Lind Aff. 10 (D. Ex. 1).

11.     Masiello's report specifically named and praised other members of his slate, including John McMahon, Fred Celeste, and Dave Fitzgerald. *Id.*; D. Ex. 2, 4.

12.     The last section of Masiello's report was titled "Thanks" and concluded, "We will continue to represent all of our members in a way that benefits **YOU!**  I want to thank you for supporting my administration in all that we do."  D. Ex. 4 (emphasis in original.)

13.     Immediately adjacent to the report on the front page of the newspaper was a graphic urging members to "Remember to vote."  *Id.*

14.     Out of 16 offices, independent candidates won only one major and three entry-level offices: President, Trustee (1), and Area Steward (2).  Table 1.  Only two of these three entry-level candidates actively cooperated with the other independent candidates.  LINDAFF.  The other 12 positions were won by candidates from the Masiello slate.  Table 1 *supra*; D. Ex. 2, 3; Lind Aff. 13 (D. Ex. 1).

15.     Kelly O'Shea, an independent candidate for Executive Vice President, filed an internal appeal of the results of the 2001 elections with the Union and subsequently with the National Association of Letter Carriers ("NALC").  Table 1, *supra*; Pl.F. 29-36; D. Ex. 5; Lind Aff. 14-19 (D. Ex. 1).

16.     Among the grounds for her objections, O'Shea alleged that Masiello's end-of-term report was campaign literature which should not have been printed with Union funds.  She also alleged that the Union erred in using the Murdock Mailing list to distribute ballots rather than the voter eligibility list generated by NALC" (this practice is discussed below). D. Ex. 5, pp. 2, 4; Lind Aff. 14 (D. Ex. 1).

17.     O'Shea complained of the effects of these and other violations on all independent candidates and also complained about violations specifically affecting Michael Yerkes, the independent candidate for Secretary Treasurer.  D. Ex. 5, pp. 1-4.

4

18. Yerkes ran against David Fitzgerald, a member of the Masiello slate who was praised by name in Masiello's end-of-term report. *Compare* Fact 11, *supra with* Table 1 *supra*.

19. In addition to her internal appeal, O'Shea filed a complaint with the Department of Labor seeking to have the 2001 elections overturned. D. Ex. 6; Lind Aff. 15 (D. Ex. 1).

20. NALC refused to rule on the questions of whether Masiello's end-of-term report was campaign literature and whether the Union should have used the NALC list rather than the Murdock Mailing list. Exhibit 6 to Plaintiff's Motion for Summary Judgment ("Pl. Ex."), p. 2; Lind Aff. 16 (D. Ex. 1).

21. NALC ordered only that the election for Executive Vice President should be re-run on grounds unrelated to the end-of-term report. Specifically, NALC found that Branch 34 failed to include O'Shea's campaign literature in a publication of all candidates' campaign literature. NALC did not order that any other election be re-run. Pl. Ex. 6, pp. 1-2; Lind Aff. 16, 18 (D. Ex. 1).

22. In an unrelated appeal, NALC ordered that the race for clerk be re-run because an inappropriate rule had been used to prevent an independent candidate from being nominated. Lind. Aff. 19 (D. Ex. 1).

23. The Department of Labor deferred to NALC's ruling and dismissed O'Shea's complaint in its entirety. It did not seek to void the results of any of the other 2001 elections. D. Ex. 6; Lind Aff. 18-19 (D. Ex. 1).

24. The Department of Labor specifically held that there had been no violation in the election for Secretary Treasurer and allowed the results of that election to stand. Yet the winning candidate for that position, Dave Fitzgerald, had been specifically praised by Masiello's end-of-term report. *Id.*; Fact 11, *supra*, Table 1, *supra*.

**Candidates in the 2004 Election**

25. As was typical for Branch 34 elections, potential candidates did not discuss openly their intentions or affiliations for the 2004 election until just prior to the nominations. Lind Aff. 21 (D. Ex. 1).

26. No slates were announced for the 2004 election until January 13, 2004. At that point two formal slates were formed, one headed by Masiello and one by Lind. D. Ex. 8, 9; Lind Aff. 21-23 (D. Ex. 1).

27. Table 2 (on the next page) lists the candidates in the 2004 elections and their affiliations in 2001 and 2004. Many of the candidates listed as "Independent" in 2001 were among those who cooperated on an informal basis. D. Ex. 2, 3, 8, 9; Lind Aff. 6-9, 22-23 (D. Ex. 1).

28. For each candidate in the 2004 elections, Table 2 also lists what office the candidate held prior to the elections. "Incumbent" candidates sought reelection to the same positions. Candidates marked "other" held some elective office but were running for a new position, and candidates marked "none" held no elective office. D. Ex. 7.

29. Seven candidates changed affiliation between 2001 and 2004. These candidates are listed in boldface type in Table 2. D. Ex. 2, 8, 9.

30. Most of the officers of the Union immediately prior to the 2004 election had run with the Masiello slate in 2001. Thus, most incumbents in 2004 had been associated with the Masiello administration. Table 1, *supra*; D. Ex. 2, 3, 7; Lind Aff 13, 22 (D. Ex. 1).

31. In three races, the incumbent ran with the Masiello slate in 2004 as well. Thus, although they served under the Lind administration, they were affiliated with the Masiello slate. The office sought in each of these races is listed in boldface type in Table 2. D. Ex. 2, 3, 7, 9.

**Table 2**

| Office Sought | Candidate | Slate in 2001 | Slate in 2004 | Office Held |
|---|---|---|---|---|
| President | Robert Lind | Independent | Lind | Incumbent |
| | Brian MacMullin | | Independent | None |
| | Edward Masiello | Masiello | Masiello | None |
| **Executive Vice President** | Fred Celeste | Masiello | Masiello | Incumbent |
| | **John McMahon** | **Masiello** | **Lind** | **Other** |
| Vice President | **John Fanning** | **Independent** | **Masiello** | **None** |
| | **Robert Simpson** | **Masiello** | **Lind** | **Other** |
| **Secretary Treasurer** | Ed Astedt | Masiello | Masiello | Other |
| | **Patrick Terrazzano** | **Masiello** | **Lind** | **Other** |
| | **Kelley O'Shea** | **Independent** | **Independent** | **None** |
| **Financial Secretary** | Kevin Flaherty | Independent | Lind | Other |
| | Mike McCormack | Masiello | Masiello | Other |
| CLAN Editor | Chris Cadorette | | Masiello | None |
| | **Maureen Marinelli** | **Masiello** | **Lind** | **Incumbent** |
| **Sergeant-at-Arms** | Vigo Conte | Masiello | Masiello | Incumbent |
| | Mike Murray | | Lind | None |
| **Clerk, MBA-NSBA** | Steve Mahoney | | Lind | None |
| | Wayne Poste | | Masiello | None |
| **Health Benefits Officer** | Mike Gorham | | Lind | None |
| | Mary Papa | Masiello | Masiello | Other |
| Trustees (3) | Mary Collier | | Lind | None |
| | Tina Doherty | | Masiello | None |
| | Dennis Harrison | | Lind | None |
| | **Mitch Hilton** | **Masiello** | **Independent** | **Incumbent** |
| | Paul Roche | | Masiello | None |
| | Laura Wood | | Masiello | None |
| | Mike Yerkes | | Lind | Incumbent |
| **Area Stewards (4)** | Bob Damatin | | Independent | None |
| | Thomas Eggers | | Independent | None |
| | Ron Holt | | Masiello | None |
| | Mike Kidd | | Lind | None |
| | Jerry McCarthy | | Lind | None |
| | Keith Meredith | Masiello | Masiello | Incumbent |
| | Kevin Mullingan | Independent | Lind | Incumbent |
| | Bob Stingel | | Masiello | None |
| | Bob Tremarche | | Masiello | None |
| | Dave Trifone | | Lind | None |

7

32. Finally, in four races no incumbent ran for reelection. In each of these races either the Masiello candidate held another office and the Lind candidate held none, or both candidates had the same status. Thus, the Masiello candidate was as much or more of an incumbent than the Lind candidate. The office sought in each of these races is also listed in boldface type in Table 2. D. Ex. 2, 3, 7, 8, 9.

33. Only one incumbent – Lind himself – was a Lind candidate who had not been affiliated with Masiello in 2001. All other incumbents in the 2004 elections ran with Masiello in 2001, 2004 or both. *Id.*

### The 2004 End-of-Term Report

34. As was required by the Union's Constitution, President Lind published an end-of-term report for his 2001-04 term. Pl.F. 10, 48.

35. Unlike Masiello's 2001 end-of-term report, which reached Union members at the same time as did ballots for the election, Lind's report was published in the November-December issue of the *CLAN*. Pl.F. 10, 48; D. Ex. 4; Lind Aff. 24 (D. Ex. 1).

36. President Lind's end-of-term report made no reference to the upcoming election and did not ask readers to support him. Nor was there any announcement of the election on the pages containing the report. Pl. Ex. 10, pp. 1, 2, 6.

37. President Lind's report discussed the following topics: the financial condition of the Union, the decision to modify the location of its meetings, requests by management that carrier routes be eliminated, the conversion of "full-time reserve" carrier positions to "unassigned regular" positions with fewer rights, the reorganization of carrier sections among different facilities, the creation of a legislation committee, the creation of a joint union-management Employee Assistance Program Committee, awards given to the Union's newspaper, the selection

8

of Boston as the site for the 2008 NALC convention, the relationship between Branch 34 and NALC, the conversion of part-time flexible positions to full-time positions, measures to recognize contributions of members, membership events, and charitable work. The more technical of these issues are explained in Lind's affidavit. *Id.*; Lind Aff. 25-29 (D. Ex. 1).

38.    Lind based his report in part on news stories which had appeared in the *CLAN* during his term. For each topic discussed in Lind's end-of-term report, Table 3 lists some of the previous issues of the *CLAN* in which that topic was covered. Pl. Ex. 10, pp. 1, 2, 6; D. Ex. 10; Lind Aff. 25-29 (D. Ex. 1).

39.    The 2004 end-of-term report adopted a very harsh tone towards the United States Postal Service. Pl. Ex. 6. It referred to one decision as a "fiasco" and an "attack" which was "orchestrated" by an office which "seized control" of the local district. *Id.*, p. 1. It also stated that "it takes two willing parties to sit at the table. Only one was present, Branch 34. Management's offering was an insult to the letter carrier craft." *Id.*, p. 2. It also advocated Congressional intervention to respond to "postal misdeeds" and the "hostility being provoked on the workroom floor" by management. *Id.*

40.    Other articles in the issue of the *CLAN* including the end-of-term report also used strong terms to criticize or praise different parties or to urge action by the reader. D. Ex. 11, Nov-Dec 2003.

41.    Immediately adjacent to the end-of-term report was an article entitled, "Stop the Psychotic Super!" which stated that there were enough Boston-area supervisors who "get[] a *natural HIGH* out of aggravating letter carriers" by intentionally violating the Union contract "to fill a psychiatric ward." *Id.* at Nov-Dec 2003, p. 6 (emphasis in original).

**Table 3**

| Topic Discussed | Previous Coverage |
|---|---|
| Financial condition of Branch | Jan-Feb 2003, p. 5<br>Nov-Dec 2001, p. 1 |
| Modification to monthly meeting location | Recurring, p. 1 |
| Requests by management for the elimination of carrier routes | Nov-Dec 2002, p.5<br>July-Aug 2002, p. 8-9<br>Jan-Feb 2002, p. 1 |
| "Reserve Abolishment / Reversion:" the conversion of full-time reserve carrier positions to unassigned regular positions | Mar-Apr 2003, p. 1, 5, 8<br>Jan-Feb 2003, p. 1, 5<br>Sep-Oct 2002, p. 5<br>Jul-Aug 2002, p. 8-9 |
| Reorganization by management of carrier sections among different facilities | Sep-Oct 2003, p. 1 |
| Creation of legislation committee and legislative breakfast event | Mar-Apr 2003, p. 1, 4-5<br>Recurring column since May-Jun 2002, p. 6 |
| Creation of joint union-management Employee Assistance Program Committee | Recurring column, e.g. Nov-Dec 2003, p. 12 |
| Awards to newspaper | Nov-Dec 2003, p. 1<br>Jul-Aug 2002, p. 1 |
| Selection of Boston as site for 2008 national NALC convention | Sep-Oct 2003, p. 1 |
| Relationship between Branch 34 and NALC national | Sep-Oct 2002, p. 5<br>Jan-Feb 2003, p. 8<br>Nov-Dec 2002, p. 1, 4<br>Jan 1999, pp. 1, 3 |
| Conversion of PTF (part-time flexible) positions to regular positions | Jul-Aug 2002, p. 8 |
| Recognition of membership | Recurring column, "Unsung Heroes" |
| Events including Retiree Luncheon, Letter Carrier Ball and MDA Sunset Cruise | Mar-Apr 2003, p. 6-7<br>Jul-Aug 2003, p. 5, 8-9<br>Nov-Dec 2002, p. 4, 8-9 |
| Charitable work including fundraising for Muscular Dystrophy Association, Combined Federal Campaign, and Annual NALC Food Drive | Nov-Dec 2003, p. 8, 9-10<br>Sep-Oct 2003, p. 5<br>May-Jun 2003, p. 1, 4<br>Recurring MDA column |

42.     An article in the same issue entitled "Working Together as Carriers, Working Together as a Union" characterizes management's professed concern for safety as "lip service." D. Ex. 11 at Nov-Dec 2003, p. 4. It urges readers in boldface to "start standing up for each other against the

10

abusive supervisors that know nothing about the job" and not to work off the clock. The article concludes, "We are a Union and we will prevail. What is right and just, will always prevail over what is wrong and unjust. The letter carriers of this great Union will keep the Postal Service operating in spite of those that are destroying it." *Id.*

43. A cartoon in the same issue entitled "Bound and Gagged" features mobster-like characters who have bound a letter carrier in rules and regulations. The one labeled "Congress" asks one labeled "UPS" if the letter carrier should be freed. (UPS and Fedex are "De Lobby.") UPS replies, "Nah, feed 'im to da fishes!" *Id.* at Nov-Dec 2003, p. 5.

44. The *CLAN* featured a similarly fiery tone in other issues. The previous issue included an article entitled, "And The Battle Begins" which asked, "**ARE THESE PEOPLE CRAZY?** How much blood can you get out of a stone?" *Id.* at Sep-Oct 2003, p. 6 (emphasis in original). Another article is entitled, "REMEMBER TO BLAME MANAGEMENT!!!" *Id.* at Sep-Oct 2003, p. 7 (emphasis in original). A cartoon suggests that employees have been intentionally locked in the same room as terrorists. *Id.*

45. The two issues prior to that likewise featured highly opinionated articles and cartoons. D. Ex. 11, excerpts from Jul-Aug 2003 and May-Jun 2003 issues.

### The Union's Outreach Efforts for the 2004 Election

46. The Union's Administrative Assistant, Judith Hall, followed the same procedure to update the Union's mailing list for the 2004 election that she had used for elections for over ten years. Affidavit of Judith Hall, D. Ex. 19, at ¶¶ 4-11 ("Hall Aff. 4-11").

47. Hall's practice is to update the Union's mailing list on a continual basis. Murdock Mailing Co. maintains the mailing list on its computers, but Hall provides updated information to Murdock Mailing, generally on a weekly basis. Hall Aff. 4-7 (D. Ex. 19).

48. If mail sent to a member's address is returned as undeliverable, Hall uses a number of techniques to try to track down a new address for the member. She calls the Post Office to inquire about a forwarding address. She calls the Union's parent, the National Association of Letter Carriers ("NALC") to see whether they have an address on file. She looks in the phone book for a telephone number for the member and calls to ask for the new address. *Id.*

49. It is rare that Hall can not find a new address using these techniques. However, if this does occur, and if multiple mailings have been returned as undeliverable, Hall requests that Murdock remove the member from the mailing list. The member remains recorded as a member in the membership database on the Union's computer. *Id.*

50. Hall's practice has never been to review the Union's entire mailing list prior to an election. The mailing list is 4,600 members long. It took a team of three OLMS investigators two visits of nearly a full day each to check the Union's mailing list against the National Association of Letter Carriers eligibility list. Hall Aff. 7-8, 19 (D. Ex. 19).

51. However, Hall did ensure that she had sent Murdock Mailing all of the address updates she had prior to the election. Murdock Mailing sent Hall a copy of the address list it had used to mail out ballots at approximately the time it sent out the ballots. Murdock Mailing sends such printouts to the Union occasionally, but only Murdock Mailing keeps an up-to-date version of the list. Hall may have spot checked the new version of the list to ensure that her recent changes had been entered. Hall Aff. 7-8, 11 (D. Ex. 19).

52. In addition to mailing ballots to members, the Union publicized the election in a number of other ways. It announced the election in three issues of its newspaper the *CLAN* published over a period of six months. It also announced the election in the NALC national newspaper

(*The Postal Record*) which is sent to the NALC membership list (the same list the Secretary contends that the Union should have used to mail ballots). Pl.F. 47, Lind Aff. 30-32 (D. Ex. 1).

53. The Union also posted flyers announcing the election in every worksite, posting one every month over three months. Also posted were sample ballots with bright red lettering. D. Ex. 12; Lind Aff. 30 (D. Ex. 1).

54. In addition, the Union instructed its stewards to announce the election at workplace meetings and to provide the names and addresses of members who had not received ballots to Hall. The stewards made announcements at the workplace to encourage members needing ballots to request them. Lind. Aff. 32 (D. Ex. 1).

55. Hall received a number of telephone calls from members requesting ballots and from stewards requesting ballots on behalf of other members. She recorded the names and addresses of such members and recorded when ballots were sent to them. She sent ballots to all members requesting them, regardless of whether they had already been sent one ballot. D. Ex. 20; Hall Aff. 12-18 (D. Ex. 19).

56. As members began requesting ballots, Hall realized Murdock Mailing had dropped some names from its list. She searched for a pattern among these names and found none. She asked Murdock Mailing about the problem, and after investigation, they attributed it to a computer error. With a few exceptions discussed below (Facts 69-74), Hall had not asked that the names be dropped from the list. Hall Aff. 17-18 (D. Ex. 19).

## The Results of the OLMS Investigation

57.     In response to a complaint by former Union President Edward Masiello, the Office of Labor Management Standards conducted an investigation into the 2004 Union election. Pl.F. 99-100.

58.     Investigator Kerry McEntee supervised a team of three other staff members who checked the list used by Murdock Mailing to send out ballots against the NALC membership list. They compiled a list of individuals on the NALC list who were not on the Murdock Mailing list. Pl.F. 73-76, 101-10; D. Ex. 14; Hall Aff. 19-23 (D. Ex. 19).

59.     McEntee did not personally review the entire membership list. Rather, the team worked together to compile the list of missing names. This process took the team of three at least two visits of nearly a full day each to the Union Hall. *Id.*

60.     After this review, McEntee provided the Union with an initial list of 216 names thought to be on the NALC list but not the Murdock list. Pl.F. 103; Hall Aff. 20 (D. Ex. 19).

61.     Administrative Assistant Hall compared this list with Union records. She provided McEntee with approximately 80 names she believed should not have been on the list. These included many deceased members, members listed under a maiden name on one list and a married name on another, members who were, in fact, listed on both lists and whose inclusion among the 216 was a clerical error, and individuals in other similar circumstances. Pl. F. 104-07; Hall Aff. 19-20 (D. Ex. 19).

62.     Hall also provided McEntee with a copy of her records of individuals who had requested and been mailed a ballot. *Id.*; D. Ex. 20.

63.     After receiving these materials, McEntee provided the Union with a revised list of 141 names of apparently eligible voters who were not on the Murdock list.  Of these the list stated that 83 had neither voted nor requested a ballot.  Hall Aff. 22-23.

64.     After the commencement of the instant litigation, the Department of Labor provided the Union with another revised list of 145 names which was identical to the previous version with the exception of five names.  Five new names had been added – Joseph Burke (#15), Roy Empey (#46), Joseph Freitas (#55), Gilbert Fuentes (#56), and Jodie Holmes (#70) – and the name of John Keiley, who is deceased, had been removed.  This list is attached as Exhibit 14 and will be referred to as the "OLMS list."  Pl.F. 107-08; D. Ex. 14; Hall Aff. 22-23 (D. Ex. 19).

65.     The OLMS included notations as to whether each individual had requested a ballot and/or voted in the election.  It recorded 87 individuals as never having requested ballots or voted.  The margin of victory in the race for Union President in 2004 was 84 votes.  Pl.F. 86, 109-10; D. Ex. 14.

66.     Six of the 87 individuals listed on the OLMS list as not having received ballots or voted had in fact requested and been mailed ballots.  The Union's records of these requests are attached as Exhibit 20; the check mark through each name indicates a ballot was mailed to the requester. The six individuals are Jonathan Fisher (#49 in Exhibit 14), Lisa Huertas (#72), Dorothy Johnson (#75), Kim O'Keefe (#100), Stacey Oakes (#104), and Renee Stewart (#127).  D. Ex. 14, 20; Hall Aff. 15-16, 25 (D. Ex. 19).

67.     Two of the 87 individuals listed on the OLMS list as not having received ballots were not members of the Union at the time of the 2004 election.  They are Robert Mustone (#93 in Exhibit 14) and Peter Demko (#33).  D. Ex. 15-18; Lind Aff. 34-38 (D. Ex. 1).

68.     Robert Mustone (#93 in Exhibit 14) resigned from the Union on February 2, 2004, prior to the date ballots were mailed, in order to become a supervisor. While he is recorded on the revised OLMS list as Robert M**i**stone and in the Union's membership records as Robert M**u**stone, the social security numbers on the two entries are identical.[1]  D. Ex. 14, 15; Lind Aff. 34 (D. Ex. 1).

69.     Peter Demko (#33) is not a member of the Union, only a member of its health plan. Health Plan Members are individuals who have signed up to participate in the health insurance plan sponsored by the Union without becoming a member of the Union. They do not pay regular biweekly dues to the Union, although they do make smaller payments to NALC. They are retired or work outside of the bargaining unit represented by the Union – employees working within the Union's jurisdiction can not become Health Plan Members, only regular members of the Union. An employee who once worked in the bargaining unit but who has left generally has the option of remaining a regular member of the union, becoming a Health Plan Member, or neither. Health Plan members do not have the right to vote for officers under the Union's constitution. D. Ex. 14, 16-18; Lind. Aff. 35-38.

70.     Thus, at most 79 Union members never received a ballot.[2]  Pl.F. 73, 74, 108-10; D. Ex. 14-20; Lind Aff. 34-38 (D. Ex. 1); Hall Aff 15-16, 19-25.

---

[1] Social Security numbers have been removed from the documents submitted as Defendant's Exhibits 14 and 15 for security purposes but were present on the original Union records and the lists presented by the Department of Labor to the Union. Lind compared the social security numbers on the original records. *Id*.

[2] The Secretary of Labor has stated in her Statement of Material Facts as to Which There Is No Genuine Issue that 87 Union Members never received a ballot. Pl. F. 73, 74, 108-10. Nonetheless, as the record stands, there can be no genuine dispute that only 79 members never received a ballot. The only evidence provided by the Secretary in support of the 87 figure is an affidavit by McEntee which states that 145 Union members from the NALC list were left off the Murdock Mailing list, and that 87 of the 145 never received ballots. *Id.*; Pl. Ex. 9. As discussed above, McEntee's knowledge of these figures derives from his knowledge of the OLMS list – Murdock did not personally compare the entire NALC and Murdock Mailing lists. Facts 56-62, *supra*. Thus, McEntee's statement is inadmissible as it is being used to prove the contents of the OLMS list in lieu of the OLMS list itself. Federal Rules of Evidence 1002, 1004.

71. Finally, another five of the 87 individuals recorded on the OLMS list had been removed from the Union's mailing list because the Union did not have a valid address for them despite its best efforts. They are Joseph Burke (#15 in Exhibit 14), Roy Empey (#46), Gilbert Fuentes (#56), Jodie Holmes (#70), and Angelo Sortino (#121).[3] D. Ex. 14, 21; Hall Aff. 23, 26-30 (D. Ex. 19).

72. Joseph Burke (#15 in Exhibit 14) was incapacitated at the time of the election; he has since died. A member of his family contacted the Union to request that it stop sending Burke mail as he was in a nursing home and no longer capable of reading or understanding the Union's mailings. Therefore, prior to the mailing of ballots Hall had asked Murdock Mailing to remove Burke from its list. Hall Aff. 26 (D. Ex. 19).

73. Roy Empey (#46) moved to Plymouth after he retired in 2001. The address listed for him in Exhibit 14 is the one the Union had for him in Plymouth, but that address is no longer valid. Since NALC had the same address that the Union did, Hall could not get a current address from NALC. Because the Plymouth Post Office is outside of the Union's jurisdiction, and its staff do not know Hall, she could not get their help in tracking Empey down. Before the election, after Empey's mail had been returned as undeliverable for one year, Hall asked Murdock Mailing to remove him from the list. Hall Aff. 27 (D. Ex. 19).

74. Gilbert Fuentes (#56) moved to Puerto Rico after he retired. The Union had a Puerto Rico address for him on file, but mail from that address was returned as undeliverable and Hall was unable to obtain a new address. Hall Aff. 28 (D. Ex. 19).

75. Jodie Holmes (#70) was still recorded as an employee of the Somerville Post Office at the time of the election, but she was not reporting to work and the Post Office had no valid

---

[3] Some of these individuals also have incomplete zip codes on the OLMS list. D. Ex. 14.

17

address for her.  Nor was Hall able to find one.  Mail to the address listed on Exhibit 14 was repeatedly returned as undeliverable.  Hall Aff. 29 (D. Ex. 19).

76. Finally, Angelo Sortino (#121) was in jail at the time of the election.  After mail to his home address became undeliverable, the Union began sending him mail in the care of his uncle.  After that address became undeliverable, the Union attempted to contact the uncle, but his telephone had been disconnected.  At that point, prior to the mailing of ballots, the Union knew that it had no valid address for Sortino.  Ironically, Sortino was terminated, by the Post Office, in part for failing to provide a valid mailing address for the time he was in jail.  D. Ex. 21; Hall Aff. 30 (D. Ex. 19).

77. Table 4 summarizes the above facts concerning individuals on the OLMS list.  D. Ex. 14-21; Lind Aff. 34-38 (D. Ex. 1); Hall Aff. 15-16, 23-30 (D. Ex. 19).

**Table 4**

| Status of member or former member | Number of names | Name and number on OLMS list |
|---|---|---|
| Requested and was mailed ballot | 6 | 49   John Fisher<br>72   Lisa Huertas<br>75   Dorothy Johnson<br>100  Kim O'Keefe<br>104  Stacey Oakes<br>127  Renee Stewart |
| Resigned from Union | 1 | 95   Robert Mustone |
| Health Plan Member, ineligible to vote | 1 | 33   Peter Demko |
| No valid address available | 3 | 46   Roy Empey<br>55   Joseph Freitas<br>56   Gilbert Fuentes |
| No valid address available and member incapacitated | 1 | 15   Joseph Burke |
| No valid address available and member in jail | 1 | 121  Angelo Sortino |
| **Total** | **13** | |

18

                Respectfully Submitted,

                BRANCH NO. 34, NATIONAL ASSOCIATION
                OF LETTER CARRIERS, AFL-CIO


                /s/ Wendy M. Bittner
                Catherine A. Highet, BBO #657407
                Wendy M. Bittner, BBO #044100
                Law Offices of Wendy M. Bittner
                15 Court Square, Suite 300
                Boston, MA 02108
                (617) 624-0200

Date: June 2, 2005


**Certificate of Service**

I hereby certify that I have served the foregoing upon counsel for Plaintiff, Assistant U.S. Attorney Anita Johnson, Moakley United States Courthouse, Ste. 9200, Office of the Regional Solicitor Boston, Mass. 02210, by first class mail, postage prepaid, on this day, June 2, 2005.

                /s/ Wendy M. Bittner
                WENDY M. BITTNER
                Law Offices of Wendy M. Bittner