# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELAINE L. CHAO, Secretary of Labor, United States Department of Labor,<br><br>Plaintiff<br><br>v.<br><br>BRANCH NO. 34, NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO,<br><br>Defendant | Civil Action No. 04-CV-12356-PBS |

**AFFIDAVIT OF ROBERT A. LIND**

1. My name is Robert A. Lind, and I am a resident of Melrose, Massachusetts.

2. I am President of Branch 34 of the National Association of Letter Carriers ("Union") and have held that position since April 1, 2001. Prior to serving as President I served as an Area Steward from about 1994 to March 31, 2001. I have been a member of the Union since 1970.

**The 2001 Election**

3. I first ran for President in the Union's regularly-scheduled 2001 elections which took place in March of that year. I ran against Edward Masiello, the incumbent President.

4. Masiello ran as part of a slate referred to as the "Masiello-Celeste Team." Frederick Celeste was the incumbent Executive Vice President and was running for reelection. Also on the slate was David Fitzgerald, the incumbent Financial Secretary who was running for Secretary-Treasurer against independent candidate Michael Yerkes. Exhibit 2 is a flyer distributed by the Masiello slate, listing its candidates.

5. Exhibit 3 is the Union's notice of the results of the March, 2001 elections. It lists all of the candidates who ran in the elections.

2

6.  There was no other formal slate in the 2001 election. The candidates opposing the Masiello slate ran as independents. There was, however, informal cooperation between a number of the independent candidates.

7.  For example, Michael Yerkes was the independent candidate for Secretary-Treasurer. He and I worked together to host a joint fundraiser for our campaigns.

8.  Some independent candidates also supported each other by appearing at each others' campaign events or by appearing together to distribute literature at worksites. These candidates included Michael Yerkes, Kevin Flaherty, Kevin Mulligan, Bob Meaney, John Fanning, Kelley O'Shea, and me.

9.  Although these candidates did not formally endorse each other or form a slate, many Union members were aware of our informal cooperation.

10. Masiello published an end-of-term report in the January, 2001 issue of the Union's newspaper the *CLAN*. The end-of-term report was received by members in mid February, within a few days of the day we received ballots for the 2001 election. Exhibit 4 is a copy of Masiello's end-of-term report.

11. Masiello's end-of-term report makes a number of statements concerning the misuse of Union credit cards. Masiello used accusations of credit card misuse in his 1998 election campaigns.

12. I was the only independent candidate who won a major office in the 2001 elections. The Masiello slate won 12 positions. Three independent candidates won entry-level positions as Trustees or Area Stewards, but only two of them had actively campaigned with the other independent candidates.

**The O'Shea Appeal of the 2001 Election**

13. Independent candidate Kelley O'Shea filed an internal appeal of the election results. Exhibit 5 is a copy of that appeal. In her appeal, O'Shea complained that Masiello's end-of-term report was campaign literature which should not have been published at Union expense under the LMRDA. She also complained of other violations. Defeated independent candidate Michael Yerkes is specifically named in her Complaint.

14. O'Shea also filed a complaint concerning the 2001 elections with the Department of Labor. The Department of Labor sent personnel to conduct interviews concerning the complaint. It then dismissed the complaint.

15. While O'Shea's complaint was pending at the Department of Labor, the National Association of Letter Carriers (NALC) ruled on her internal appeal. It overturned only the election in which O'Shea participated, on grounds unrelated to the Masiello end-of-term report. NALC specifically refused to rule on the propriety of Masiello's end-of-term report.

16. The Department of Labor deferred to the NALC holding and dismissed O'Shea's complaint in its entirety. Exhibit 6 is a copy of the Department's dismissal of that complaint which was sent to me in my new capacity as President. It states specifically that there was no violation in the race for Secretary Treasurer between Michael Yerkes and David Fitzgerald.

17. The result of O'Shea's appeal and complaint was that the election in which she ran, that for Executive Vice President, was re-run, but the other elections were not.

18. In a separate appeal unrelated to the O'Shea case, the National Association of Letter Carriers ordered that the election for the position of Clerk be re-run. The basis for this decision was an inappropriate rule which had prevented an independent candidate from being nominated.

**The 2004 Election**

19. Exhibit 7 is an excerpt from the Union's newspaper The *CLAN* which lists the Union's incumbent officers just prior to the 2004 elections.

20. Traditionally in Branch 34, politics and slates are not discussed openly until right before an election. Candidates do not normally reveal their intentions until nomination night. In 2004, no slates were revealed openly until January, 2004, although Masiello himself had announced his intention to run for President about a year before the election.

21. I helped form a slate referred to as the "Lind-McMahon Team" for the 2004 election. Although most of the Union's officers elected in 2001 were part of the Masiello slate which I had opposed, a number of them ran on the Lind-McMahon Team in 2004. Exhibit 8 is a flyer we distributed listing members of the slate.

22. Masiello headed a slate referred to as the "Masiello-Celeste Team." Exhibit 9 is a newspaper distributed by the slate which lists its members.

23. I wrote my end-of-term report for my 2001-04 term in late December, 2003 or early January, 2004. When I write an article for the *CLAN* I give the article either to Maureen Marinelli, the editor of the *CLAN*, or to Union Printworks, the Union's printshop, which creates the layout for the paper. I am often the last contributor to submit an article, in which case I send it directly to Union Printworks. Union Printworks provides proofs to the Union for review and the Union submits corrections. After making these corrections, Union Printworks sends the issue of the *CLAN* to a press to be printed. A sample printed newspapers is then proofread by Union Printworks. Then the paper goes to press and the copies are sent to Murdock Mailing to be addressed and prepared for mailing, and Murdock Mailing then sends them to the Post Office. They are mailed out immediately unless there are insufficient funds in the Union's account with the Post Office, in which case the Union must first replenish the account. The length of time this entire process takes varies.

24. My end-of-term report for 2004 discussed over a dozen developments which had occurred during my term. I based it in part on a review of past issues of the *CLAN* and the events reported there.

25. Exhibits 10 and 11 are excerpts from the *CLAN*.

26. Most of the developments discussed in the report can be understood from reading the report, but a few may be difficult to understand to a non-member of the Union.

27. The report discusses "Reserve Abolishment / Reversion." This is a process that does not eliminate any employees but does re-categorize them in such a way that they lose certain seniority and bidding rights. The positions are converted from "full-time reserve" positions to "unassigned regular" positions. Sometimes unassigned regular carriers are then declared "in excess" of the needs of their station, even though the station continues to use them full time; this further reduces their rights. During my term the Union fought repeatedly with management over these types of conversions.

28. The report also discusses the reorganization of carrier sections. During my term, the Post Office attempted to avoid certain contractual obligations towards its employees by dividing a building in two with a wall and declaring it to be two separate facilities. The Union argued that the building was a single facility and prevailed.

29. Finally, the report discusses the conversion of PTF letter carriers (part-time flexible) to regular, full-time positions. Two contractual provisions commonly referred to as "88 / 12" and "maximization" require the Post Office to convert PTF employees to full time employees when PTF employees exceed 12% of the letter carriers or when a supposedly part-time employee has, in fact been working full time over a long period. During my term the Union's officers and stewards spent a considerable amount of time enforcing these provisions.

30. In addition to mailing ballots and notices of the 2004 elections to members' homes, the Union sent notices of the election to be posted on the Union bulletin board in every worksite. These notices were sent out in January, February and March of 2004. In addition, sample ballots with bright red writing were posted in every worksite. Exhibit 12 is a copy of these notices and sample ballot.

31. In addition, I sent a notice of the election to be published in the monthly magazine ("*The Postal Record*") sent by NALC to its mailing list. Notices of the election were also published in the *CLAN* which was sent to the mailing list maintained by Murdock Mailing.

32. In addition, every worksite has at least one steward and usually more. These stewards make announcements when all the employees at the site are gathered together for "service talks" given by the employer. During the monthly Union meetings leading up to the election, stewards were instructed to announce the upcoming election and to invite any member who had not received a ballot to notify the steward or call the Union directly. They did so by making multiple announcements encouraging members to request ballots if they did not have them.

5

33. Exhibit 13 is a copy of NALC's ruling on the internal election appeal filed by Edward Masiello in this case.

**Individuals on the OLMS list**

34. Exhibit 15 is a copy of one of the Union's membership records. It indicates that Robert Mustone resigned from the union on February 2, 2004 in order to become a supervisor. The original contained Mustone's complete social security number. Name number 99 on the Exhibit 14 is Robert M<u>i</u>stone, but the full social security numbers for the two entries are identical.

35. Exhibit 16 is an excerpt from a list of the "Health Plan Members" for Branch 34, and it shows that Peter Demko (#34 in Exhibit 14) is a Health Plan Member. The column titled "Type" in Exhibit 16 indicates whether the individual is working or a retiree. The Column titled "Opt" indicates the type of health care plan he or she participates in. The original document showed the social security number of each participant.

36. Health Plan Members are individuals who have signed up to participate in the health insurance plan sponsored by the Union without becoming a member of the Union. They do not pay regular biweekly dues to the Union, although they do make smaller payments to NALC. They are retired or work outside of the bargaining unit represented by the Union – employees working within the Union's jurisdiction can not become Health Plan Members, only regular members of the Union. An employee who once worked in the bargaining unit but who has left generally has the option of remaining a regular member of the union, becoming a Health Plan Member, or neither.

37. Exhibit 17 is a letter I received from the National Association of Letter Carriers confirming the National's position that Health Plan Members are ineligible to vote.

38. Exhibit 18 is an excerpt from the Constitution of the National Association of Letter Carriers indicating that Health Plan Members are ineligible to vote.

Signed under the pains and penalties of perjury this 2 day of June, 2005.

                /s/ Robert Lind_____
                Robert Lind, President
                National Association of Letter Carriers
                Branch 34